64 P.3d 594 (2003)
148 Wash.2d 738
STATE of Washington, Respondent,
v.
Adam Lamour ACREY, Petitioner.
No. 72259-5.
Supreme Court of Washington, En Banc.
Argued November 14, 2002.
Decided February 27, 2003.
*595 Nielsen, Broman & Assoc., Christopher Gibson, Seattle, WA, for Petitioner.
Norm Maleng, King County Prosecutor, Daniel Clark, Deputy, Seattle, WA, for Respondent.
SMITH, J.[*]
Petitioner Adam Lamour Acrey, a juvenile born March 4, 1988, seeks discretionary review of a decision of the Court of Appeals, *596 Division One,[1] which affirmed his disposition in the King County Superior Court, Juvenile Division, for possession of cocaine and marijuana in violation of the Uniform Controlled Substances Act under RCW 69.50.401(d) and 69.50.401(e) and an order denying his motion to suppress evidence.
The Court of Appeals concluded that Respondent State of Washington, acting in its community caretaking function, was lawfully entitled to briefly detain Petitioner, a 12-year-old minor, on the streets in a commercial area of Renton shortly after midnight to contact his mother by telephone and that a search of Petitioner's person was reasonable under the Fourth Amendment to the United States Constitution. We granted review. We affirm.

QUESTION PRESENTED
The sole question in this case is whether the Court of Appeals was correct in affirming a decision of the trial court concluding that, under the Fourth Amendment to the United States Constitution, the "community caretaking function" exception to the warrant requirement permits police officers to detain a 12-year-old minor on a city street in a commercial area after midnight while they contact his mother after lawfully stopping him and determining he was not involved in criminal activity.

STATEMENT OF FACTS
Petitioner Adam Lamour Acrey, a 12-year-old minor, was charged by information in the King County Superior Court, Juvenile Division, on September 20, 2000 with possession of cocaine in violation of the Uniform Controlled Substances Act under RCW 69.50.401(d).[2] The information was amended to add a second count charging possession of less than 40 grams of marijuana in violation of RCW 69.50.401(e).[3]
On October 16, 2000, Petitioner filed a motion to suppress evidence of cocaine and marijuana seized by a Renton police officer, arguing the officer unlawfully detained and searched him.[4] During a fact-finding hearing in the Juvenile Court on October 23, 2000 the Honorable Julie Spector denied the motion[5] and on November 17, 2000 signed written findings of fact and conclusions of law in compliance with Criminal Rule (CrR) 3.6 and Juvenile Court Rule (JuCR) 7.11(d).
On September 18, 2000, in Renton, Washington, at approximately 12:41 in the morning, Renton Police Officers James D. Gould and Tracy Wilkinson, along with other police officers, responded to an anonymous 911 telephone call reporting juveniles fighting in a commercial area along Rainier Avenue North just south of the 900 block. When Officer Gould arrived in the area he observed five male youths who appeared quite young and fit the description provided by the anonymous caller. He stopped the youths and asked if they had been fighting. They responded they had merely been playing around and were walking to a 7-Eleven convenience store located approximately four to five miles away.
The officers concluded no one had been fighting, no one was injured, and no criminal activity was underway. But since it was after midnight on a week night in a commercial area with no open businesses and no nearby residences, the officers asked for the boys' names and home telephone numbers. They directed the boys to sit on the sidewalk while the officers called their homes.[6]
Petitioner falsely identified himself as "Jubuare Davison," but did give his correct telephone number and his mother's name, Ms. Jennifer Landgraf. Officer Wilkinson telephoned Ms. Landgraf, who provided Petitioner's correct name and asked the officers to bring him home because she did not have *597 an automobile. Honoring her request, Officer Wilkinson asked Officer Gould to transport Petitioner home.
Before placing Petitioner in his patrol car, following standard police procedure, Officer Gould made a pat-down search of Petitioner for weapons, despite not then believing Petitioner was armed. He felt something at the bottom of Petitioner's pants leg and asked what it was. Petitioner said it was money, but because it did not feel like money, Officer Gould removed a rubber band securing the object to Petitioner's ankle. Coins, paper money, and two baggies of green vegetable matter then fell from Petitioner's pants leg. Officer Gould immediately recognized the vegetable matter as marijuana. He placed Petitioner under arrest. A search incident to the arrest uncovered more packaged marijuana, money, and crack cocaine in Petitioner's pants and right sock.
The juvenile court, Judge Julie Spector, found that the officers had reasonable cause to stop Petitioner to investigate a fight and had lawful grounds to extend the stop to call Petitioner's mother as part of their community caretaking function.[7] The court also ruled that the police officers were permitted to pat-down search Petitioner out of concern for safety before placing him in the patrol vehicle and that removing the objects from Petitioner's ankle was within the proper scope of that search.
After admitting the evidence, including the evidence obtained incident to the arrest, the trial court held a disposition hearing on November 17, 2000.[8] The court found Petitioner "guilty" of both counts of violation of the Uniform Controlled Substances Act. The court imposed a disposition of 2 months of community supervision and 8 hours of community service. Petitioner appealed to the Court of Appeals, Division One. The Court of Appeals, the Honorable Anne L. Ellington writing, affirmed Petitioner's disposition and the order denying his motion to suppress the cocaine and marijuana evidence.[9] Petitioner claimed the drugs were the fruit of an illegal search and seizure. The court disagreed and concluded that (1) the initial detaining of Petitioner was reasonable under Terry v. Ohio,[10] (2) the continued detaining of Petitioner while the officers telephoned his mother was reasonable under the "community caretaking function" exception to the warrant requirement, and (3) the protective pat-down search of Petitioner before the officers placed him in the patrol vehicle for transportation home as requested by his mother was reasonable under State v. Wheeler.[11]
Petitioner sought review by this court. In his petition and his supplemental brief, Petitioner raised only the issue of the validity of his detention by police officers while they telephoned his mother.[12] Review was granted on September 6, 2002.

DISCUSSION

STANDARD OF REVIEW
Petitioner filed a motion to suppress the cocaine and marijuana evidence in the King County Superior Court, Juvenile Division. The court denied the motion and on November 17, 2000 signed findings of fact and conclusions of law in compliance with Criminal Rule (CrR) 3.6 and Juvenile Court Rule (JuCR) 7.11(d). In reviewing findings of fact on a motion to suppress, this court "`will review only those facts to which error has been assigned.'"[13] Petitioner has not assigned error to the findings of fact. We therefore treat them as verities.[14] This court *598 reviews "conclusions of law in an order pertaining to suppression of evidence de novo."[15]

FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION
The Fourth Amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[16] Generally, under the Fourth Amendment, a police officer's seizure of either evidence of a crime in a constitutionally protected area or seizure of a crime suspect must be supported by a judicial warrant based on probable cause.[17] A warrantless seizure is therefore presumed unreasonable under the Fourth Amendment.[18] Nevertheless, it is also well-settled that this presumption of unreasonableness may be rebutted by a showing that a specific exception to the warrant requirement applies in the case under consideration.[19] "The State bears the burden of showing a seizure without a warrant falls within one of these exceptions."[20]
Respondent State of Washington argues, and Petitioner concedes,[21] that the initial approach and warrantless detention of Petitioner was permissible as an investigative stop under Terry v. Ohio.[22] Respondent also asserts the continued warrantless detention of Petitioner after police officers determined Petitioner was not involved in any criminal activity was permissible under the "community caretaking function" exception to the warrant requirement.

INVESTIGATIVE STOP EXCEPTION
Among those categorical exceptions to the warrant requirement in which it is predetermined that a warrantless seizure is reasonable are brief investigative stops, also referred to as "stop and frisk" searches or "Terry stops." A police officer may conduct an investigative stop based upon less evidence than is needed for probable cause to make an arrest.[23] A brief investigative stop is permissible whenever the police officer has a reasonable suspicion, grounded in specific and articulable facts, that the person stopped has been or is about to be involved in a crime.[24]
In evaluating the reasonableness of an investigative stop, courts consider the totality of the circumstances, including the officer's training and experience, the location of the stop, and the conduct of the person detained.[25] Other factors that may be considered *599 in determining whether a stop was reasonable include "the purpose of the stop, the amount of physical intrusion upon the suspect's liberty, and the length of time the suspect is detained."[26]
A lawful Terry stop is limited in scope and duration to fulfilling the investigative purpose of the stop.[27] If the results of the initial stop dispel an officer's suspicions, then the officer must end the investigative stop. If, however, the officer's initial suspicions are confirmed or are further aroused, the scope of the stop may be extended and its duration may be prolonged.[28] For example, police officers making a lawful investigative stop may protect themselves by conducting a search for concealed weapons whenever "[the officer] has reason to believe that the suspect is armed and dangerous."[29]
As he did in the Court of Appeals,[30] Petitioner concedes that his initial detainer by police officers constituted a lawful Terry stop.[31] He contends, however, that once the officers confirmed he was not involved in criminal activity, he should not have been further detained. The State argues that, under the "community caretaking function" exception to the warrant requirement, because of Petitioner's extreme youth and his after-midnight presence in a commercial area, the officers were entitled to detain Petitioner until they obtained his name and contacted his mother by telephone.

"COMMUNITY CARETAKING FUNCTION" EXCEPTION
The Court of Appeals correctly observed that "`local police have multiple responsibilities, only one of which is the enforcement of criminal law.'"[32] "`[M]any citizens look to the police to assist them in a variety of circumstances, including delivering emergency messages, giving directions, searching for lost children, assisting stranded motorists, and rendering first aid.'"[33]
When police officers are engaged in noncriminal, noninvestigative "community caretaking functions," "whether a particular stop is reasonable depends not on the presence of `probable cause' or `reasonable suspicion,' but rather on a balancing of the competing interests involved in light of all the surrounding facts and circumstances."[34]
The United States Supreme Court first enunciated the "community caretaking function" exception to the warrant requirement in Cady v. Dombrowski.[35] With respect to the Fourth Amendment to the United States *600 Constitution, the Supreme Court observed that
Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.[36]
In Cady, the Supreme Court held that Wisconsin police officers who had arrested a Chicago police officer for driving while intoxicated did not violate the Fourth Amendment in searching the suspect's automobile for a service revolver which the arresting officers believed Chicago police officers were required to carry at all times. The Court concluded the warrantless search of the disabled vehicle was "constitutionally reasonable" because it was incident to the community caretaking function of the arresting officers to protect "the safety of the general public who might be endangered if an intruder removed a revolver from the trunk of the vehicle."[37]
In this State, the "community caretaking function" exception to the warrant requirement encompasses "not only the `search and seizure' of automobiles, but also situations involving either emergency aid or routine checks on health and safety."[38] In this case, the State argues that Petitioner's encounter with the police officers involved the "routine check on health and safety" aspect of the "community caretaking function" exception.[39]
In determining whether an officer's encounter with a person is reasonable as part of a routine check on safety, we must balance the "`individual's interest in freedom from police interference against the public's interest in having the police officers perform a community caretaking function.'"[40] We must "cautiously apply the community caretaking function exception because of `a real risk of abuse in allowing even well-intentioned stops to assist.'"[41] Even a routine stop for a safety check, if it involves a "seizure" by detaining, must be necessary and strictly relevant to performance of the noncriminal investigation.[42] "The noncriminal investigation must end when reasons for initiating an encounter are fully dispelled."[43]
The Court of Appeals correctly held that the officers' brief detention of Petitioner was part of a routine safety check which was necessary and relevant to a noncriminal *601 investigation.[44] In balancing the "State's significant interest in protecting a child against the child's significant interest in moving free of police intrusion" the Court of Appeals stated
Raising child welfare concerns were the facts that [Petitioner] was a 12-year-old boy, out after midnight on a weeknight without adult supervision, in an isolated area with no residences or open businesses. Most notably, the officers had stopped [Petitioner] to conduct a criminal investigation in response to a citizen 911 call. Thus, there was reason for heightened concern that the boys may be engaging in conduct that, while not criminal, could bring harm to themselves or others. The record indicates that the time required for the officer to reach [Petitioner's] mother was no more than a matter of minutes. The officers' conduct seems entirely reasonable.[[45]]
Petitioner argues that under State v. Kinzy his brief detention was illegal. In Kinzy, we found unreasonable the "seizure" of a 16-year-old woman by police officers and their actions which followed after balancing the juvenile's "interest in freedom from police intrusion and [her] freedoms of association, expression and movement" against the State's interest in child safety based upon the juvenile's perceived age and height, the late hour, her presence in a high narcotics trafficking area and her association with a narcotics trafficker.[46] The court struck the balance in favor of privacy "because `[t]he policy of the Fourth Amendment is to minimize governmental confrontations with the individual,'"[47] holding the young woman's seizure unreasonable and therefore unconstitutional.
The Court of Appeals distinguished this case from Kinzy, stating the following:

Kinzy teaches that we must examine the particular facts of each police encounter to determine whether the officers acted reasonably under the circumstances. Here, several important facts tip the scales in favor of briefly detaining Acrey while officers called his mother: Acrey was younger than Kinzy, and the hour much later; Acrey was in an isolated area unaccompanied by an adult; and most important, the officers had initially detained Acrey to investigate a possible crime. The fact that a 911 call had been placed raised at least some degree of concern for Acrey's well-being, regardless of whether there was any criminal activity; the next person to notice the boys "playing around" might have responded with something less benign than a 911 call. Perhaps most important, the fact that Acrey had been legitimately detained in a Terry stop meant that there was merely a momentary additional intrusion for community caretaking purposes.
We also emphasize that the officers' purpose in detaining Acrey was to confer with his mother. In Kinzy, the court suspected the officer was actually enforcing a de facto curfew law, thereby abusing the community caretaking function. One reason juvenile curfew laws are disfavored is because they tend to interfere with parents' rights to choose whether to allow their children out at night. Here, the officers explicitly deferred that decision to Acrey's *602 mother. Thus, this brief seizure served the additional purpose of advancing a mother's right to direct her child's upbringing.
In determining the reasonableness of a governmental intrusion, courts consider the totality of the circumstances, balancing the character of the intrusion and its justification against the individual's right to personal autonomy. Considering those competing interests, we conclude that the State's interest in protecting Acrey outweighed Acrey's interest in moving freely for the brief time it took the officers to call his mother. The brief extension of what had been a valid Terry stop occurred in a lawful exercise of the officers' community caretaking duties.[[48]]
The Court of Appeals applied a general reasonableness analysis which inquires whether the police officers' actions were appropriate under the surrounding circumstances.[49] The court observed that once the officers concluded that "no crime had been committed, their focus shifted from law enforcement to ensuring the welfare of [Petitioner] and his young friends"[50] and that the officers were "divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."[51]
The Court of Appeals, focusing on reasonableness, correctly balanced the State's significant interest in protecting a child against the significant interest of the child in moving free of police intrusion. There was minimal intrusion in detaining Petitioner long enough to ask him for his name and telephone number and to telephone his mother. The 12-year-old Petitioner was younger than the 16-year-old juvenile in Kinzy. The officers encountered Petitioner after midnight. They were acting on a reasonable, articulable suspicion of criminal activity when they initially detained Petitioner in the company of other youth and no adults in an isolated commercial area with no open businesses and no nearby residences. The police officers were acting in their "community caretaking function" and not in their law enforcement capacity when they asked Petitioner for his name and home telephone number and contacted his mother.
Petitioner did not dispute in the Court of Appeals that once his mother requested the officers' assistance in bringing him home, the officers permissibly complied with the request under their community caretaking function.[52] Nor did he dispute that the officers were justified in conducting a pat-down search of him before placing him in the patrol vehicle because of officer safety concerns.
The Court of Appeals noted the search of Petitioner before placing him in the patrol vehicle was reasonable to protect the safety of the officers.[53] The search was limited to a pat-down of Petitioner's outer clothing. Because that search revealed a suspicious and unidentified bulky object, the officer was entitled to "take the steps necessary to assure himself that the object was not a weapon."[54] The officer appropriately removed a rubber band which secured the object to Petitioner's ankle. After coins, money, and two baggies of vegetable matter, immediately recognized by the officer as marijuana, fell from Petitioner's pants leg, the officer lawfully arrested *603 Petitioner. The arrest and subsequent search were reasonable under the Fourth Amendment to the United States Constitution.

SUMMARY AND CONCLUSIONS
Under the Fourth Amendment to the United States Constitution, a warrantless "seizure" is presumed unreasonable. This presumption may be rebutted by a showing that a specific exception to the warrant requirement applies. One exception to the warrant requirement is a brief investigative stop, sometimes referred to as a Terry stop.
Another exception to the warrant requirement arises when police officers engage in their noncriminal, noninvestigative "community caretaking function." This exception normally applies to police action involving search and seizure of automobiles, emergency aid, and routine checks on health and safety. The courts cautiously apply this exception. It may not be used as a pretext for a criminal investigation.
In this case, Petitioner, a 12-year-old minor, was initially detained shortly after midnight at 12:41 in the morning in a brief investigative stop in a commercial area on a city street after police officers responded to an emergency telephone call reporting juveniles fighting on a city street in an isolated commercial area. Once the officers concluded Petitioner was not involved in any criminal activity, they nevertheless continued to detain him for the brief time it took them to telephone his mother. The Court of Appeals correctly relied on the officers' community caretaking function in holding the brief detention of Petitioner was reasonable and lawful.
Petitioner did not dispute that once his mother requested the officers' assistance in bringing him home, they permissibly complied with her request under their "community caretaking function." Nor did he dispute that the officers were justified in conducting a pat-down search before placing him into a patrol vehicle to transport him home. We affirm the Court of Appeals.
ALEXANDER, C.J., and JOHNSON MADSEN, IRELAND, BRIDGE, CHAMBERS, and OWENS, JJ., concur.
SANDERS, J. (dissenting)
The Fourth Amendment to the United States Constitution generally requires a judicial warrant and probable cause for a search or seizure. Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). One exception to the warrant requirement is police acting in a community caretaking role. Cady v. Dombrowski, 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). When acting in this role, police may at times be justified in making a warrantless search. Id. at 447 (finding a warrantless search of the trunk of a car was reasonable to secure a gun thought to be in the trunk). We recently interpreted the limits to the community caretaking exception in Washington in State v. Kinzy, 141 Wash.2d 373, 5 P.3d 668 (2000), cert. denied, 531 U.S. 1104, 121 S.Ct. 843, 148 L.Ed.2d 723 (2001).
The community caretaking exception is a narrow exception. Community caretaking encompasses functions "`totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" Id. at 385, 5 P.3d 668 (quoting Cady, 413 U.S. at 441). It extends to offering emergency aid and even to routine checks on health and safety. Id. at 387. However, while the community caretaking exception "serves as a vehicle allowing police to check on persons who appear to be in need of aid," once police determine aid is not needed the contact should end. Kinzy, 141 Wash.2d at 396-97, 5 P.3d 668 (Madsen, J., concurring).[1]
If it is determined that police have engaged in a search or seizure implicating the Fourth Amendment while acting in their community caretaking role, the reasonableness of that search is determined by "`balancing of the individual's interest in freedom from police interference against the public's *604 interest in having the police perform a "community caretaking function."`" Id. at 387, 5 P.3d 668 (quoting Kalmas v. Wagner, 133 Wash.2d 210, 216-17, 943 P.2d 1369 (1997)). Questioning which does not include detention or seizure of the person questioned will likely be reasonable. Id. at 394, 5 P.3d 668. However, if the person questioned does not feel free to end the encounter or to leave, i.e., if a seizure has occurred, "[b]alancing the interests will not necessarily favor action by police." Id. at 394, 5 P.3d 668. "When in doubt, the balance should be struck on the side of privacy because the policy of the Fourth Amendment is to minimize government intrusion into the lives of citizens." Id. at 394-95, 5 P.3d 668. Kinzy cautioned that the community caretaking exception must be cautiously applied to avoid police abuses in even well intentioned stops. Id. at 388, 5 P.3d 668.
In Kinzy we held police seizure of a girl who appeared to be 11 to 13 years old for questioning because she was on the street at night in a drug trafficking area in the company of an adult associated with drug trafficking was not within the community caretaking function. Kinzy, 141 Wash.2d at 379, 5 P.3d 668. Although police were justified to approach to ask the girl if she needed aid, once she declined, the encounter should have ended. Id. at 395-96, 5 P.3d 668. We held the State's "interest in maintaining the safety of children did not outweigh Petitioner's constitutional interests in freedom of association, expression and movement." Id. at 391-92, 5 P.3d 668. We held that seizure violated the Fourth Amendment and the resultant evidence should have been suppressed. 141 Wash.2d at 393, 5 P.3d 668.
In my view the present case cannot be distinguished from Kinzy. Here police seized a 12-year-old minor (Adam Acrey) for questioning after he was discovered on the street after midnight in the company of three or four other juveniles on a weeknight.[2] Clerk's Papers (CP) at 19. Once police determined that the boys were not fighting, they no longer had any particular reason to believe that Acrey was in need of aid and the encounter should have ended, as we held in Kinzy. Kinzy, 141 Wash.2d at 395-96, 5 P.3d 668. If anything, the situation in which police found Acrey was less indicative of a need for aid than that in which police found Kinzy. Police did not find Acrey in an area of the city notorious for drug trafficking in the company of a known drug trafficker, as was the case in Kinzy. Here the boys were walking down Rainier Avenue, a major thoroughfare, after midnight on a weeknight. While I personally believe young boys should not be out without their parents at that hour, the community caretaking exception does not justify police seizing these minors consistent with the holding in Kinzy. See id. at 391-92, 5 P.3d 668.
The majority seeks to distinguish the seizure of Acrey from that of Kinzy because Acrey was only 12 while Kinzy was 16. Majority at 16. This fact cannot distinguish the cases, however. When police seized Kinzy they believed she was between 11 and 13 years old, i.e., the same age as Acrey. The reasonableness of a seizure cannot be determined in hindsight but must be determined by the reasonableness of the decision at the time. When that decision was made the police did not know she was 16. Thus, the actual age of the minors is not distinguishing.
The majority further seeks to distinguish Kinzy by claiming Acrey was approached on the street after midnight while Kinzy was approached just after 10:00 p.m. Majority at 16. But Kinzy rejected the lateness of the hour as appropriate grounds for detaining a minor under the community caretaking function. See Kinzy, 141 Wash.2d at 391, 5 P.3d 668 (suggesting that such a seizure would be *605 enforcement of a de facto curfew without legal justification).[3]
Moreover, such a de facto curfew would be an unconstitutional restraint on the liberty of minors in itself. See Kinzy, 141 Wash.2d at 391, 5 P.3d 668 (citing City of Seattle v. Pullman, 82 Wash.2d 794, 795 n. 1, 514 P.2d 1059 (1973); State v. J.D., 86 Wash.App. 501, 511, 937 P.2d 630 (1997)). In City of Seattle v. Pullman, 82 Wash.2d 794, 514 P.2d 1059 (1973), we found that a juvenile curfew law that forbade loitering, idling, or playing on the streets after curfew was not a valid regulation within the police power because it did not bear a substantial relationship to the State's legitimate interest in protecting minors. See Pullman, 82 Wash.2d at 802, 514 P.2d 1059. In State v. J.D. the Court of Appeals noted that a broadly drawn curfew law "impermissibly infringes on minors' right of free expression." 86 Wash.App. at 509, 937 P.2d 630. Moreover, regulations which infringe on freedom of movement must be justified by a compelling need or they are unconstitutional. Id. at 508, 937 P.2d 630. The citation of these decisions by Kinzy indicates that the community caretaking exception cannot be invoked by police as justification for seizing minors on the streets after dark.
Because the seizure of Acrey can no more be justified under the community caretaking exception here than it was in Kinzy, the trial court erred when it denied Acrey's motion to suppress the drug evidence that was obtained as a result of Acrey's seizure.
The motion to suppress should also have been granted because the pat-down search violated the Fourth Amendment.[4] The Court of Appeals found the search before giving Acrey a ride was justified under State v. Wheeler, 108 Wash.2d 230, 737 P.2d 1005 (1987). State v. Acrey, 110 Wash.App. 769, 777, 45 P.3d 553 (2002) (citing Wheeler, 108 Wash.2d at 235-36, 737 P.2d 1005). I disagree. Wheeler does not apply here at all. In Wheeler police transported a crime suspect in their patrol car in handcuffs to a witness identification. Wheeler, 108 Wash.2d at 233, 737 P.2d 1005. But Adam Acrey was not a suspect when he was searched because police had determined the boys were not involved in the reported fighting which had initially justified the investigative stop. CP at 20.
The Court of Appeals found the pat-down search of Acrey was also justified on grounds of officer safety. Acrey, 110 Wash.App. at 777, 45 P.3d 553. But we have held protective frisks of suspects temporarily in police custody are justified where officers have reasonable safety concerns based on "`specific and articulable facts' which create an objectively reasonable belief that a suspect is `armed and presently dangerous.'" State v. Collins, 121 Wash.2d 168, 173, 847 P.2d 919 (1993) (quoting Terry v. Ohio, 392 U.S. 1, 21-24, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Here 12-year-old Adam was not a crime suspect, and the officer who was to give him a ride did not think the 12-year-old Acrey was armed. CP at 20. Such circumstances do not provide sufficient justification for a search on grounds of officer safety. The officer was no more at risk than would be a taxi driver called to take the 12-year-old home, or a school bus driver, or school teacher for that matter. Because the seizure of Adam Acrey was unreasonable under the reasoning in Kinzy and the pat-down search unjustified as a safety precaution, the evidence gathered as a result of the seizure and search should have been suppressed.
I therefore dissent.
NOTES
[*] Judge Charles Z. Smith is serving as a justice pro tempore of the Supreme Court pursuant to Const. art. IV, § 2(a).
[1] State v. Acrey, 110 Wash.App. 769, 45 P.3d 553 (2002).
[2] Clerk's Papers at 1.
[3] Id. at 10-11.
[4] Id. at 3-9.
[5] Id. at 12.
[6] Petitioner testified he felt like he was in custody and that he had no choice but to give the officers his telephone number. He also testified he did not want a ride home but felt obligated to get into the patrol car. Id. at 20.
[7] Id. at 21.
[8] Id. at 13.
[9] Acrey, 110 Wash.App. 769, 45 P.3d 553.
[10] 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
[11] 108 Wash.2d 230, 235-36, 737 P.2d 1005 (1987).
[12] Petitioner argued at trial that, even if the initial detention to investigate the report of fighting was valid, the police officers could not further detain him to contact his mother. He also argued that the pat-down search was invalid. Report of Proceedings at 38-42.
[13] State v. Kinzy, 141 Wash.2d 373, 382, 5 P.3d 668 (2000) (quoting State v. Hill, 123 Wash.2d 641, 647, 870 P.2d 313 (1994)).
[14] Id.
[15] State v. Mendez, 137 Wash.2d 208, 214, 970 P.2d 722 (1999).
[16] U.S. Const. amend. IV. The Fourth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
[17] See, e.g., Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)

(searches "conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonablesubject only to a few specifically established and well-delineated exceptions.").
[18] Kinzy, 141 Wash.2d at 384, 5 P.3d 668 (citing State v. Houser, 95 Wash.2d 143, 149, 622 P.2d 1218 (1980)).
[19] Houser, 95 Wash.2d at 149, 622 P.2d 1218 ("Nonetheless, there are a `few jealously and carefully drawn exceptions to the warrant requirement which provide for those cases where the societal costs of obtaining a warrant ... outweigh the reasons for prior recourse to a neutral magistrate.'") (quoting Arkansas v. Sanders, 442 U.S. 753, 759, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979) (some quotation marks omitted)).
[20] Kinzy, 141 Wash.2d at 384, 5 P.3d 668.
[21] Br. of Appellant at 8.
[22] Terry, 392 U.S. at 21, 88 S.Ct. 1868.
[23] State v. Glover, 116 Wash.2d 509, 513, 806 P.2d 760 (1991) (citing Terry, 392 U.S. at 25-26, 88 S.Ct. 1868).
[24] United States v. Hensley, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985).
[25] Glover, 116 Wash.2d at 514, 806 P.2d 760 (citing United States v. Cortez, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).
[26] State v. Williams, 102 Wash.2d 733, 740, 689 P.2d 1065 (1984).
[27] Id. at 739-41, 689 P.2d 1065.
[28] Id. at 739-40, 689 P.2d 1065.
[29] Adams v. Williams, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).
[30] Acrey, 110 Wash.App. at 773, 45 P.3d 553.
[31] Br. of Appellant at 8.
[32] Acrey, 110 Wash.App. at 773, 45 P.3d 553 (quoting Debra Livingston, Police, Community Caretaking, and the Fourth Amendment, 1998 U. Chi. Legal F. 261, 261 (1998)).
[33] Kinzy, 141 Wash.2d at 387, 5 P.3d 668 (quoting Hudson v. City of Wenatchee, 94 Wash.App. 990, 996, 974 P.2d 342 (1999)); see also John F. Decker, Emergency Circumstances, Police Responses, and Fourth Amendment Restrictions, 89 J.Crim. L. & Criminology 433, 445-46 (1999) ("Law enforcement officers generally act pursuant to either law enforcement or community caretaking objectives. The difference between the two stems from the officers' underlying motives. The law enforcement function includes conduct that is designed to detect or solve a specific crime, such as making arrests, interrogating suspects, and searching for evidence. Community caretaking, on the other hand, is based on a service notion that police serve to ensure the safety and welfare of the citizenry at large. For example, this may involve approaching a seemingly stranded motorist or lost child to inquire whether he or she needs assistance, assisting persons involved in a natural disaster, or warning members of a community about a hazardous materials leak in the area" (footnotes omitted)).
[34] State v. Chisholm, 39 Wash.App. 864, 867, 696 P.2d 41 (1985) (citing South Dakota v. Opperman, 428 U.S. 364, 370 n. 5, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976)); see also State v. Mennegar, 114 Wash.2d 304, 313, 787 P.2d 1347 (1990), rev'd on other grounds by State v. Hill, 123 Wash.2d 641, 645, 870 P.2d 313 (1994).
[35] 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973).
[36] Id. at 441, 93 S.Ct. 2523.
[37] Id. at 447, 93 S.Ct. 2523.
[38] Kinzy, 141 Wash.2d at 386, 5 P.3d 668; see, e.g., Mennegar, 114 Wash.2d at 313, 787 P.2d 1347 (recognizing the public safety aspect of the community caretaking function).
[39] The emergency aid function, as contrasted to routine checks on health and safety, "involves circumstances of greater urgency and searches resulting in greater intrusion. It applies when `(1) the officer subjectively believed that someone likely needed assistance for health or safety reasons; (2) a reasonable person in the same situation would similarly believe that there was a need for assistance; and (3) there was a reasonable basis to associate the need for assistance with the place searched.'" Kinzy, 141 Wash.2d at 386-87, 5 P.3d 668 (quoting State v. Menz, 75 Wash.App. 351, 354, 880 P.2d 48 (1994)); see, e.g., State v. Loewen, 97 Wash.2d 562, 647 P.2d 489 (1982) (search of automobile accident victims for identification); State v. Jordan, 79 Wash.2d 480, 487 P.2d 617 (1971) (warrantless entry of motel room to examine defendant at request of motel maid when defendant appeared gray and unmoving on bed).
[40] Kinzy, 141 Wash.2d at 387, 5 P.3d 668 (quoting Kalmas v. Wagner, 133 Wash.2d 210, 216-17, 943 P.2d 1369 (1997)); see, e.g., Kalmas, 133 at 216-17, 943 P.2d 1369 (the exception applied when one of the parties "called 911 asking for police assistance and [then invited the officer] into his residence ... to perform a caretaking function."); State v. Villarreal, 97 Wash.App. 636, 643-44, 984 P.2d 1064 (1999) (the exception applied to stop and identification inquiry of defendant found urinating in public because of the "concern for the health and public safety implications that may follow from the elimination of human waste in a public place."); Hudson, 94 Wash.App. at 995-96, 974 P.2d 342 (allowing police officers to unlock vehicles promotes a fundamental purpose of government).
[41] Kinzy, 141 Wash.2d at 388, 5 P.3d 668.
[42] Id.; see also State v. Cerrillo, 114 Wash.App. 259, 54 P.3d 1250, 1254 (2002).
[43] Kinzy, 141 Wash.2d at 388, 5 P.3d 668.
[44] Although not referred to by the parties or the courts, the officers' conduct may have been permissible under the Family Reconciliation Act, chapter 13.32A RCW, "which clearly is designed to promote the public interest in the safety of children." Kinzy, 141 Wash.2d at 389, 5 P.3d 668.

RCW 13.32A.050 states in relevant part that
(1) A law enforcement officer shall take a child into custody:
. . . .
(b) If a law enforcement officer reasonably believes, considering the child's age, the location, and the time of day, that a child is in circumstances which constitute a danger to the child's safety or that a child is violating a local curfew ordinance....
RCW 13.32A.060 states in relevant part that
(1) An officer taking a child into custody ... shall inform the child of the reason for such custody and shall:
(a) Transport the child to his or her home or to a parent.... In responding to the request of the parent, the officer shall take the child to a requested place....
. . . .
[45] Acrey, 110 Wash.App. at 774-75, 45 P.3d 553.
[46] Kinzy, 141 Wash.2d at 391, 392, 5 P.3d 668.
[47] Id. at 392, 5 P.3d 668 (quoting United States v. Dunbar, 470 F.Supp. 704, 708 (D.Conn.), aff'd, 610 F.2d 807 (2d Cir.1979)).
[48] Acrey, 110 Wash.App. 769-70, 45 P.3d 553 (footnotes omitted).
[49] See, e.g., Commonwealth v. Waters, 20 Va.App. 285, 456 S.E.2d 527, 530 (Va.App.1995) ("The appropriateness of applying the community caretaking doctrine to a given factual scenario is determined by whether: (1) the officer's initial contact or investigation is reasonable; (2) the intrusion is limited; and (3) the officer is not investigating criminal conduct under the pretext of exercising his community caretaking function.").
[50] Acrey, 110 Wash.App. at 773-74, 45 P.3d 553.
[51] Cady, 413 U.S. at 441, 93 S.Ct. 2523.
[52] Acrey, 110 Wash.App. at 777, 45 P.3d 553.
[53] Wheeler, 108 Wash.2d at 235-36, 737 P.2d 1005 (1987) ("Frisking and handcuffing defendant for the 2-block ride back to the scene of the burglary was not impermissibly intrusive.").
[54] Acrey, 110 Wash.App. at 777 n. 28, 45 P.3d 553 (quoting State v. Hudson, 124 Wash.2d 107, 113, 874 P.2d 160 (1994) ("`If the officer feels an item of questionable identity that has the size and density such that it might or might not be a weapon, the officer may only take such action as is necessary to examine such object.'")).
[1] The majority opinion garnered four signatures and Justice Madsen's concurrence provided the fifth decisive vote, which makes the reasoning in the concurrence especially important in interpreting the holding in Kinzy.
[2] Although the encounter began as an investigative stop based on an anonymous tip that boys were fighting in the area, at the time that police told the boys to sit down to wait while they called their parents, the police no longer suspected the boys of fighting. Clerk's Papers at 25. Since the suspicion justifying an investigative stop was gone, continued detention by police required separate justification. See State v. Armenta, 134 Wash.2d 1, 15-16, 948 P.2d 1280 (1997) (investigatory detention meets constitutional requirements only so long as officer reasonably suspects person seized is engaged in criminal activity).
[3] Of course, if a curfew law applied there would be no need to invoke the community caretaking exception because violation of a curfew would provide grounds for detaining a minor out in violation of the law.
[4] The majority asserts that Acrey did not challenge the pat-down search on appeal. Majority at 17. The Court of Appeals also claimed that Acrey had not challenged the pat-down search. State v. Acrey, 110 Wash.App. 769, 777, 45 P.3d 553 (2002). However, Acrey did challenge the pat-down search as unjustified under the community caretaking function in briefing before the Court of Appeals. Br. of Appellant at 12; Reply Br. of Appellant at 4. In any case, since the challenge here involves a claim of a manifest error affecting a constitutional right we could accept review of this issue even had it not been raised below. RAP 2.5(a).