# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 77480-8-I |
| Appellant, | ) ) | DIVISION ONE |
| v. | ) ) | UNPUBLISHED OPINION |
| JESUS J. VILLARREAL, | ) ) | |
| Respondent. | ) ) | Filed: September 30, 2019 |

LEACH, J. — The State appeals the trial court's suppression of drug evidence obtained from Jesus Villarreal's car. It challenges the trial court's findings of fact and conclusions of law and asserts the evidence was not the fruit of an illegal seizure. Substantial evidence supports the findings of fact, which in turn support the trial court's conclusion that police unlawfully seized Villarreal. Because the illegal seizure resulted in the finding of the drug evidence, we affirm the trial court.

## FACTS

On February 5, 2016, Whatcom County Sheriff's Deputy Jason Nyhus was on routine patrol along the Guide Meridian in Bellingham with his K-9 deputy partner, Hyde. Nyhus was wearing a uniform, carrying a gun, baton, and stun gun, and driving a marked patrol car.

At approximately 11:30 p.m., Nyhus saw headlights on Thomas Road. He could not tell if the car was moving. Thomas Road is a dead-end gravel street that connects to the Guide Meridian and lies west of Meridian Street. The area contains a few commercial buildings and a residence. Nyhus described it as industrial and not well lit. And he had "never seen any activity at these businesses at that late hour." Also, city officers had told Nyhus about a series of commercial burglaries that occurred in the region at least a month earlier.

Nyhus watched the car from the Guide Meridian. He saw the car come out to the Guide, pass him, and drive onto Meridian Street. Nyhus turned around and pulled behind it, going south. The car turned into the Intercontinental Market parking lot. Nyhus followed and parked between one-and-a-half to two car lengths behind it. Nyhus testified that he was "not really blocking it in" because the parking lot was about 60 feet wide and if the driver "turned [his] wheels to the right, [he] would have been able to back out" without Nyhus moving his car. Nyhus did not activate his overhead lights or his siren. He did not recall running a license plate check.

When Nyhus walked up to the car, Villarreal opened the door on the driver's side. Nyhus stood "well outside [from] where the door would swing," about 6 to 10 feet away from Villarreal, who remained seated. He did not tell Villarreal to "stop or move or physically change his location in any way." Nyhus

did not make physical contact and recalls speaking in a "normal conversational tone." He described the occupants as "pleasant to talk to." He did not "feel any sort of risk of . . . threats" to himself, and he was not "giving any orders or anything like that."

Nyhus stated that Villarreal "seemed very nervous and seemed evasive." He had "sores on his face that would be consistent with methamphetamine use." And "his mannerisms were jerking and kind of robotic-like which is consistent with narcotics use." Nyhus was "concerned about his impairment since he was driving." He also had concerns that because of the signs of methamphetamine use, "there may have been some kind of crime being committed that they could have been leaving from."

Nyhus talked to the occupants about their activities on Thomas Road. The driver said he was "just picking up something at a friend's." Nyhus asked the friend's name and address. Villarreal gave a first name but did not have a last name or address for the friend. Nyhus "asked again if he had a contact number where [Nyhus] could call the person and just ask were these gentlemen just at your house." Villarreal did not provide any contact information for the friend and did not initially tell Nyhus what he had picked up.

Nyhus asked Villarreal and his passenger for identification. Villarreal produced a Washington identification card and said he did not have a driver's license.

Nyhus asked the passenger to speak with him at the patrol car so Villarreal could not hear the conversation. The passenger agreed. He gave answers inconsistent with Villarreal's.[1] Nyhus's routine check of Villarreal's license showed that it was suspended/revoked in the third degree. He then called for backup. At least two deputies arrived while Nyhus was talking to the passenger by his patrol car, the first approximately 10-15 minutes after the initial contact. After Nyhus finished questioning the passenger, he told him he was free to go.

Nyhus told Villarreal that he was under arrest for driving with a suspended license and advised him of his Miranda[2] rights. During this conversation, Villarreal said he had methamphetamine in the car. He also asked Nyhus the purpose of the contact. Nyhus said he "basically explained to [Villarreal] why [he] had so many questions . . . and why [Villarreal] was being contacted." Nyhus then asked for consent to search the car. Nyhus testified that Villarreal asked why Nyhus wanted to search the car and whether he would be arrested if he did

---

[1] Nyhus did not testify about the content of the passenger's statements.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

-4-

not consent to the search. Nyhus did not feel at that point that consent would be voluntary. Villarreal was detained in an additional deputy's patrol car.

K-9 Hyde inspected the exterior of the vehicle. Hyde alerted to the odor of narcotics in the car near the driver's door. Nyhus had the car impounded. Following execution of a search warrant, investigators searched the car and found methamphetamine.

The State charged Villarreal with unlawful possession of methamphetamine. Villarreal asked the trial court to suppress the evidence found in his car as the fruit of an illegal seizure. After a hearing, the trial court granted his request to suppress evidence and entered findings of fact and conclusions of law explaining its decision. The State appeals.

## ANALYSIS

The State challenges the trial court's decision to suppress the drug evidence found in Villarreal's car. We reject this challenge.

When this court reviews a trial court's suppression decision, it examines whether substantial evidence supports the challenged findings and whether the conclusions of law flow from the findings.[3] Substantial evidence is evidence sufficient to persuade a reasonable person of the truth of the finding.[4] This court considers unchallenged findings of facts as true on appeal.[5] Because it is a

---

[3] State v. Ross, 106 Wn. App. 876, 880, 26 P.3d 298 (2001).
[4] State v. Vickers, 148 Wn.2d 91, 116, 59 P.3d 58 (2002).
[5] State v. Gaines, 154 Wn.2d 711, 716, 116 P.3d 993 (2005).

question of law, we review whether the findings support the legal conclusions de novo.[6] We also review the constitutionality of a warrantless stop de novo.[7]

Substantial Evidence Supports the Challenged Findings

The State first contends that substantial evidence does not support this findings of fact:

> 7.    Deputy Nyhus engaged in a conversation with Mr. Villarreal about where they were, where they were coming from, and what they were doing. Mr. Villarreal indicated he had picked something up from a friend, but was unable to provide the friend[']s address, phone number, last name, or indicate what he had picked up.

Nyhus testified that he spoke to Villarreal about "where they were coming from, what they were doing." He stated that Villarreal told him he had been "at the dead end off the road just picking up something at a friend's." Nyhus testified that he "asked for the friend's name or address" but that Villarreal could not "provide a last name" or an address. Nyhus's report states that when he asked for a phone number, Villarreal "said he did not think it was necessary." And Nyhus testified that initially Villarreal did not show, tell, or give him "any indication as to what he had picked up." This evidence is substantial evidence that supports the challenged finding.

---

[6] State v. Weyand, 188 Wn.2d 804, 811, 399 P.3d 530 (2017); State v. I.B., 187 Wn. App. 315, 319-20, 348 P.3d 1250 (2015).
[7] State v. Gatewood, 163 Wn.2d 534, 539, 182 P.3d 426 (2008).

The State also challenges the following finding of fact if this court "accepts [Villarreal's] interpretation" of it:

9.  Deputy Nyhus asked to speak with the passenger and asked the passenger to get out of the car. The passenger spoke with Deputy Nyhus near Deputy Nyhus'[s] patrol car in order to be out of earshot of Mr. Villarreal. The passenger provided information inconsistent with the information provided by Mr. Villarreal. It is unclear from the testimony whether the deputy talked to the passenger before or after he learned that Mr. Villarreal's license was suspended. The passenger was told he was free to leave.

Villarreal interprets this finding to mean that "before Nyhus requested [his] identification," Nyhus "elevated the encounter by removing the passenger and questioning him separately by the patrol car." But Nyhus testified that he requested Villarreal's identification and Villarreal told him that he did not have a valid license before Nyhus asked the passenger to talk with him next to his patrol car. The record does not support Villarreal's interpretation. Because the State only challenged Villarreal's interpretation of this finding, which we reject, we need not address this issue further.

### Nyhus Seized Villarreal

The State next contests when Nyhus's contact stopped being a social one and became a seizure.

The Fourth Amendment to the United States Constitution and article I, section 7 of the Washington State Constitution prohibit any unreasonable search and/or seizure. A court presumes that a warrantless seizure is unreasonable

unless the State shows that one of a few very limited exceptions applies.[8] Because article I, section 7 of the Washington State Constitution "'grants greater protection to individual privacy rights than the Fourth Amendment,'" this court evaluates whether a seizure occurred under the Washington Constitution.[9]

A seizure occurs when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."[10] Because the test is objective, if the officer does not use physical force the question is whether, given all the circumstances, a reasonable person would have felt free to end the encounter.[11] The test relies upon an analysis of "the interaction between the person and the officer" and not "the officer's suspicions."[12]

Courts in Washington distinguish between a social contact, which article I, section 7 generally permits, and a warrantless seizure, which it generally prohibits.[13] Because courts have not defined a social contact, the term "occupies an amorphous area . . . , resting someplace between an officer's saying 'hello' to

---

[8] State v. Acrey, 148 Wn.2d 738, 746, 64 P.3d 594 (2003).
[9] State v. Flores, 186 Wn.2d 506, 512, 379 P.3d 104 (2016) (quoting State v. Harrington, 167 Wn.2d 656, 663, 222 P.3d 92 (2009)).
[10] United States v. Medenhall, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980).
[11] State v. O'Neill, 148 Wn.2d 564, 574, 62 P.3d 489 (2003); State v. Young, 135 Wn.2d 498, 510-11, 957 P.2d 681 (1998).
[12] O'Neill, 148 Wn.2d at 575.
[13] Harrington, 167 Wn.2d at 664; State v. Nettles, 70 Wn. App. 706, 712, 855 P.2d 699 (1993).

a stranger on the street and, at the other end of the spectrum," a seizure.[14] A reasonable person would not expect a social contact to have an "investigative component."[15]

Examples of interactions that courts have considered social contacts include officers asking for identification or birth data and checking for outstanding warrants.[16] The fact that an officer is in uniform or carrying a firearm does not elevate an interaction from a social contact to a seizure.[17] During a social contact, an officer need not warn the citizen of his right to remain silent or walk away.[18]

An interaction becomes a seizure if the officer demands information from the person, commands the person to halt, or orders the person to wait while checking the person's warrant status.[19] And a social contact may become a seizure if the officer "blocks the defendant from leaving."[20] Also, factors such as "'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of

---

[14] Harrington, 167 Wn.2d at 664.

[15] Harrington, 167 Wn.2d at 664.

[16] O'Neill, 148 Wn.2d at 570; State v. Armenta, 134 Wn.2d 1, 11, 948 P.2d 1280 (1997); State v. Hansen, 99 Wn. App. 575, 577, 994 P.2d 855 (2000).

[17] State v. Belanger, 36 Wn. App. 818, 820, 677 P.2d 781 (1984).

[18] State v. Mote, 129 Wn. App. 276, 281, 120 P.3d 596 (2005).

[19] O'Neill, 148 Wn.2d at 581; State v. Beito, 147 Wn. App. 504, 508-09, 195 P.3d 1023 (2008); State v. Ellwood, 52 Wn. App. 70, 73, 757 P.2d 547 (1988).

[20] State v. Coyne, 99 Wn. App. 566, 573, 995 P.2d 78 (2000).

language or tone of voice indicating that compliance with the officer's request might be compelled'" weigh in favor of a contact being a seizure.[21] Single actions by an officer that might by themselves be a social contact, if taken sequentially and viewed cumulatively, may constitute an unlawful seizure.[22]

The State challenges these two conclusions of law:

2.    Deputy Nyhus'[s] contact with Mr. Villarreal was not an innocent social contact as the reason for such contact was based solely on generalized, non-specific suspicion surrounding Mr. Villarreal's presence on Thomas Road, the information the deputy had from one or two months prior about burglaries in the north part of the city, and Mr. Villarreal's abrupt entry into the parking lot of the market where he was contacted.

. . . .

5.    A reasonable person in Jesus Villarreal's situation on August 5, 2016 would not have felt free to terminate the encounter with Deputy Nyhus or leave. Therefore, Mr. Villarreal was seized. Deputy Nyhus'[s] contact with Mr. Villarreal's passenger, in conjunction with all of the circumstances of this contact, elevated the contact to a Terry[23] stop with insufficient specific and particularized reasonable suspicion.

The State disagrees with the trial court's conclusion about when Nyhus seized Villarreal. It contends that until Nyhus "had reasonable, specific evidence that [Villarreal] was driving without a valid license and possessed methamphetamine," a person in Villarreal's situation would have felt free to leave. It relies on these

---

[21] Harrington, 167 Wn.2d at 664 (internal quotation marks omitted) (quoting Young, 135 Wn.2d at 512).

[22] Harrington, 167 Wn.2d at 668.

[23] Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

facts: (1) Nyhus did not physically prevent Villarreal from driving away or fully block Villarreal's car, (2) Nyhus walked up to speak to Villarreal, and (3) he neither turned on his overhead lights or sirens nor made any other show of authority before talking to Villarreal.

But the totality of the circumstances shows that the trial court correctly decided that a reasonable person would not have felt free to leave. Unchallenged findings state that Nyhus parked behind Villarreal and walked up to the driver's side of the car and Villarreal opened his door. Nyhus parked his car one to two car lengths behind Villarreal so if Villarreal wanted to drive away, he would have to close his door on Nyhus and turn his wheel to the right to avoid hitting the patrol car.

Finding 7 states that Nyhus asked Villarreal questions about "where they were, where they were coming from, and what they were doing." In addition, this finding states that Villarreal "was unable to provide the friend['s] address, phone number, [or] last name." As discussed above, substantial evidence supports finding 7. Nyhus testified that he asked for the first and last name and phone number of the friend Villarreal claimed to be visiting because he wanted to corroborate Villarreal's description of his activities earlier in the evening.[24]

---

[24] The trial court did not make this finding, but this court "may affirm a trial court's decision on a different ground if the record is sufficiently developed to consider the ground fairly." State v. Sondergaard, 86 Wn. App. 656, 657-58, 938 P.2d 351 (1997).

-11-

Given the totality of the circumstances, once Nyhus asked for the friend's contact information and indicated his intent to contact people about Villarreal's behavior, any social contact ended and the interaction became a seizure. At that point, Nyhus's actions would "create the impression [in the mind of a reasonable person] that the police were conducting an ongoing investigation concerning the vehicle" and would indicate to Villarreal that he was not free to leave.[25] So the record supports the trial court's conclusion that "[a] reasonable person in Jesus Villarreal's situation on August 5, 2016 would not have felt free to terminate the encounter with Deputy Nyhus or leave."

Apart from this statement, the trial court misapplied the law to the facts in these two challenged conclusions of law. First, the trial court concluded that the interaction was a social contact because Nyhus contacted Villarreal "based solely on generalized, non-specific suspicion." But a court does not consider an officer's personal suspicions and intentions to determine whether an interaction was a seizure.[26]

Second, the trial court concluded that the interaction was a seizure based on "Deputy Nyhus'[s] contact with Mr. Villarreal's passenger, in conjunction with all of the circumstances of this contact." But the court also found that it was "unclear from the testimony whether the deputy talked to the passenger before or

---

[25] State v. Johnson, 8 Wn. App. 2d 728, 742-43, 440 P.3d 1032 (2019).
[26] O'Neill, 148 Wn.2d at 575.

after he learned that Mr. Villarreal's license was suspended." Because an officer may seize a person observed driving with a suspended license, the court's uncertainty about when Nyhus learned that Villarreal's license was suspended means insufficient evidence supports its conclusion that the conversation with the passenger led to an unlawful seizure.[27]

This court "may affirm a trial court's decision on a different ground if the record is sufficiently developed to consider the ground fairly."[28] The record shows that Nyhus seized Villarreal when he asked for Villarreal's friend's phone number with the stated intent of contacting him. So we review the lawfulness of this seizure.

### Nyhus Did Not Have Sufficient Grounds To Seize Villarreal

The State contends that at the point the interaction became a seizure, Nyhus had grounds for an investigative stop.

Brief questioning during a Terry[29] investigative stop is one exception to the warrant requirement. In general, a court's analysis of a Terry stop is similar under both article I, section 7 and the Fourth Amendment.[30] The State must show that the officer reasonably suspected that the person was engaged in, or was about to engage in, criminal activity.[31] Reasonable suspicion is a lower standard than

---

[27] See, e.g., O'Neill, 148 Wn.2d at 581-82.
[28] Sondergaard, 86 Wn. App. at 657-58.
[29] Terry, 392 U.S. at 30-31.
[30] State v. Z.U.E., 183 Wn.2d 610, 617, 352 P.3d 796 (2015).
[31] Terry, 392 U.S. at 30-31; Weyand, 188 Wn.2d at 811.

probable cause, but the officer's reasonable suspicion must be based upon "specific and articulable facts[ ] that the person stopped has been or is about to be involved in a crime."[32] Article I, section 7 requires that the State show the officer was investigating a particular crime rather "than a mere generalized suspicion that the person detained is 'up to no good.'"[33]

To determine the reasonableness of a seizure, a court evaluates the totality of the circumstances.[34] Factors a court considers include the training and experience of the officer, the seizure's location, purpose, and duration, the intrusiveness of the seizure on the suspect's liberty, and the conduct of the suspect.[35] If a court finds that the seizure was unlawful, the court generally must suppress all evidence the search produced.[36]

"The Supreme Court embraced the Terry rule to stop police from acting on mere hunches."[37] "Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction."[38] Washington courts have concluded that "[a] person's presence in a high-crime area at a 'late hour' does

---

[32] Acrey, 148 Wn.2d at 747.
[33] Z.U.E., 183 Wn.2d at 618.
[34] Weyand 188 Wn.2d at 811-12 (quoting State v. Fuentes, 183 Wn.2d 149, 158, 352 P.3d 152 (2015)).
[35] Acrey, 148 Wn.2d at 747.
[36] Wong Sun v. United States, 371 U.S. 471, 484-85, 83 S. Ct. 407, 9 L. Ed. 2d. 441 (1963); State v. Larson, 93 Wn.2d 638, 645-46, 611 P.2d 771 (1980).
[37] State v. Doughty, 170 Wn.2d 57, 63, 239 P.3d 573 (2010).
[38] Terry, 392 U.S. at 22.

not, by itself give rise to a reasonable suspicion to detain that person."[39]

Similarly, a person's "awkward behavior" or surprise at seeing a police officer is insufficient to provide grounds for a Terry stop.[40]

The State challenges the conclusion that states,

4. General and non-specific, non-particularized information, based on a briefing one to two months before the subject incident, indicating a rash of burglaries in northern Bellingham did not give Deputy Nyhus a reasonable suspicion, derived from specific, articulable facts, that criminal activity was afoot. Accordingly, the seizure of Mr. Villarreal was unlawful.

The State contends that Nyhus had reasonable, articulable suspicion to detain Villarreal because Villarreal admitted to not having a driver's license after Nyhus observed him driving, Nyhus knew there had been burglaries in the area, and he thought that Villarreal's appearance and behavior was consistent with methamphetamine use. But, as discussed above, Nyhus learned Villarreal did not have a valid license only after the contact had become a seizure. And courts have made clear that neither a person's presence in an area where criminal activity has occurred nor "suspicious" affect provides sufficient grounds for a Terry stop.[41] Villarreal's seizure was unlawful. The trial court properly suppressed the drug evidence as a fruit of this unlawful seizure.

---

[39] Doughty, 170 Wn.2d at 62 (citing Ellwood, 52 Wn. App. at 74).
[40] State v. Young, 167 Wn. App. 922, 931-32, 275 P.3d 1150 (2012); Gatewood, 163 Wn.2d at 540-41.
[41] See, e.g., Doughty, 170 Wn.2d at 62 (citing Ellwood, 52 Wn. App. at 74).

No. 77480-8-I / 16

CONCLUSION

Nyhus seized Villarreal when he asked for Villarreal's friend's contact information accompanied by his statement that he intended to check on Villarreal's activities. Nyhus did not have sufficient grounds to seize Villarreal because he did not have a reasonable, articulable suspicion that Villarreal had been or was going to be engaged in criminal activity. We affirm.

_Leach, J._

WE CONCUR:

_Schindler, J_  _Appelwick C.J_

-16-