**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 11 WAP 2016 |
| | : | |
| Appellee | : | Appeal from the Order of the Superior |
| | : | Court entered December 21, 2015 at |
| | : | No. 1829 WDA 2014, affirming the |
| v. | : | Judgment of Sentence of the Court of |
| | : | Common Pleas of Erie County entered |
| | : | October 20, 2014 at No. CP-25-CR- |
| VICTORIA LIVINGSTONE, | : | 0002750-2013 |
| | : | |
| Appellant | : | ARGUED:  November 2, 2016 |


*Justice Todd announces the Judgment of the Court, and delivers the Opinion of the Court with respect to Parts I, II(A), II(B), and III.  Chief Justice Saylor and Justice Dougherty join the opinion in full.  Justice Baer joins Parts I, II(A), and II(B) of the opinion.  Justices Donohue and Wecht join Parts I, II(A), and III of the opinion.*


**OPINION**


**JUSTICE TODD**                                **DECIDED: NOVEMBER 27, 2017**

We granted review in this matter to consider whether Appellant, Victoria Livingstone, who was in a stopped vehicle on the side of the road, was subjected to an investigatory detention without reasonable suspicion of criminal activity[1] when a police

---

[1] This Court has recognized three categories of interaction between citizens and the police.  The first is a mere encounter, or request for information, which need not be supported by any level of suspicion.  *Commonwealth v. Strickler*, 757 A.2d 884, 889 (Pa. 2000).  The second category of interaction, an investigative detention or *Terry* stop, *see Terry v. Ohio,* 392 U.S. 1 (1968), "subjects an individual to a stop and period of detention but is not so coercive as to constitute the functional equivalent of an arrest." *Strickler*, 757 A.2d at 889.  To survive constitutional scrutiny, "an investigative detention must be supported by a reasonable and articulable suspicion that the person seized is (continued…)

officer, ostensibly seeking only to inquire about her need for assistance, pulled his patrol car, with its emergency lights activated, alongside her vehicle. For the reasons set forth below, we conclude that Appellant was subjected to an illegal investigatory detention. Furthermore, although we take this opportunity to recognize the public servant "exception" to the warrant requirement under the community caretaking doctrine, which in certain circumstances will permit a warrantless seizure, we conclude that the doctrine does not justify the detention of Appellant under the facts of this case. Thus, we hold that the Superior Court erred in affirming the trial court's denial of Appellant's motion to suppress evidence obtained as a result of her illegal investigatory detention, and we reverse the Superior Court's decision and remand for further proceedings.

## I. Background

On June 14, 2013, at approximately 9:30 p.m., Pennsylvania State Trooper Jeremy Frantz was traveling northbound on Interstate 79 in his marked police cruiser when he observed a vehicle pulled over onto the right shoulder of the road; the engine was running, but the hazard lights were not activated. Trooper Frantz activated his emergency lights and, with his passenger window down, pulled alongside the stopped vehicle. Appellant, the sole occupant of the vehicle, was sitting in the driver's seat and appeared to be entering an address into her vehicle's navigation system. According to Trooper Frantz's testimony at the suppression hearing, when he first made eye contact with Appellant, she gave him a "hundred mile stare," which Trooper Frantz described as "glossy eyes" and "looking through [him]." N.T. Suppression Hearing, 5/28/14, at 7. Trooper Frantz motioned for Appellant to roll down her window, and he asked her if she

---

(…continued)
engaged in criminal activity and may continue only so long as is necessary to confirm or dispel such suspicion." *Id.* Finally, an arrest or custodial detention must be supported by probable cause to believe the person is engaged in criminal activity. *Id.*

was okay. Appellant answered affirmatively. When asked where she was going, Appellant stated that she was traveling to New York for a dragon boat race. At that point, Trooper Frantz pulled his cruiser in front of Appellant's vehicle, exited the cruiser, and approached Appellant's vehicle on foot. At approximately the same time, another trooper pulled behind Appellant's vehicle, but, when he exited his vehicle, that trooper remained in front of his police cruiser and did not make contact with Appellant. *Id.* at 12.

When he reached Appellant's vehicle on foot, Trooper Frantz asked to see Appellant's driver's license, and, when asked if she had been drinking, Appellant replied that she had not, but that she would like to once she arrived at her destination. She explained that she had finished working at 8:00 p.m., and had been driving for approximately 90 minutes. The audio of Trooper Frantz's dashboard camera video, which was introduced at the suppression hearing, reveals that Appellant repeatedly told Trooper Frantz that she was "a CEO of five companies" and worked long hours. *Id.* at 10. She also repeatedly stated that she had two sons at the Citadel,[2] and she told Trooper Frantz that she was afraid of him, and afraid that her sons would get in trouble because of her being stopped. *Id.* at 11. Based on the appearance of her eyes and the fact that she was acting "confused," Trooper Frantz asked Appellant to exit her vehicle so that he could perform field sobriety tests. *Id.* He indicated that, at that point, "[s]he was an emotional wreck. She was crying, constantly repeating herself about the fact that she's a CEO of five companies." *Id.* at 13. Trooper Frantz then advised Appellant that he intended to administer a portable breathalyzer test ("PBT"), and, assuming it was clear, he would help her get to her destination. As neither of the troopers had a

---

[2] The Citadel is a military college in South Carolina.

PBT in their cruisers, another officer brought one to the scene. The results of the PBT indicated the presence of alcohol in Appellant's system. As a result, Trooper Frantz placed Appellant under arrest, and transported her to the police barracks where an EMT administered a blood test. The test revealed that Appellant had a blood alcohol content (BAC) of .205%. Accordingly, Appellant was charged with DUI - General Impairment,[3] DUI - Highest Rate of Alcohol,[4] and Careless Driving.[5]

On March 17, 2014, Appellant filed a pre-trial motion to suppress evidence of her BAC on the basis that, once Trooper Frantz activated his emergency lights and pulled alongside her vehicle, she was subjected to an investigative detention unsupported by reasonable suspicion. Following an evidentiary hearing, the Honorable Ernest J. DiSantis, Jr. denied the motion on June 18, 2014, concluding that Trooper Frantz, after observing Appellant's vehicle on the side of the interstate, had a duty to determine whether Appellant was in need of assistance, and his "act of approaching [Appellant's] vehicle with his overhead emergency lights was a mere encounter." Trial Court Opinion, 6/18/14, at 4-5. The trial court further determined that, once he observed the Appellant's confused demeanor and "glossy" eyes, "it was reasonable for him to continue his inquiry." *Id.* at 5. On October 20, 2014, at a stipulated non-jury trial, at which the trial court took judicial notice of the facts presented at the suppression hearing, Appellant was convicted of all charges, and sentenced to an aggregate term of 24 months intermediate punishment, with the first 90 days to be served on electronic monitoring, followed by probation, and fines and costs.

---

[3] 75 Pa.C.S. § 3802(a)(1).

[4] 75 Pa.C.S. § 3802(c).

[5] 75 Pa.C.S. § 3714(a).

Appellant appealed her judgment of sentence to the Superior Court, wherein she argued that Trooper Frantz's act of pulling alongside her vehicle with his emergency lights activated, when her vehicle was stopped on the side of the road, but the hazard lights were not activated and there were no visible signs of distress to the driver or vehicle, and when Trooper Frantz had not observed any vehicle violations or received any report of a vehicle in need of assistance, was an investigative detention and that the trial court erred in deeming it a mere encounter. The Superior Court affirmed Appellant's judgment of sentence in a unanimous, unpublished memorandum opinion. *Commonwealth v. Livingstone*, 1829 WDA 2014 (Pa. Super. filed Dec. 21, 2015).

The Superior Court began its analysis by setting forth the following standard for determining whether the initial interaction between Appellant and Trooper Frantz constituted a mere encounter or an investigative detention:

> To determine whether a mere encounter rises to the level of an investigatory detention, we must discern whether, as a matter of law, the police conducted a seizure of the person involved. To decide whether a seizure has occurred, a court must consider all the circumstances surrounding the encounter to determine whether the demeanor and conduct of the police would have communicated to a reasonable person that he or she was not free to decline the officer's request or otherwise terminate the encounter. Thus, the focal point of our inquiry must be whether, considering the circumstances surrounding the incident, a reasonable person innocent of any crime, would have thought he was being restrained had he been in the defendant's shoes.

*Id.* at 3-4 (quoting *Commonwealth v. Collins*, 950 A.2d 1041, 1046-47 (Pa. Super. 2008)).

The Superior Court then rejected Appellant's claim that the activation of emergency lights on a police cruiser immediately renders an interaction between an officer and a citizen an investigative detention, noting that it rejected that same

argument in *Commonwealth v. Johonoson*, 844 A.2d 556 (Pa. Super. 2004), *Commonwealth v. Conte*, 931 A.2d 690 (Pa. Super. 2007), and *Commonwealth v. Kendall*, 976 A.2d 503 (Pa. Super. 2009). In *Johonoson*, a state trooper was traveling on a rural road in the early morning when he observed a slow-moving vehicle with its flashers activated. Without using his turn signal, the driver, Johonoson, pulled his vehicle to the side of the road. The trooper pulled his cruiser behind the vehicle, activated his emergency lights, exited his cruiser, and approached the vehicle, where he noticed severe damage to both sides of the car. When he began to speak with Johonoson, the trooper immediately observed signs of intoxication. Johonoson subsequently was arrested for DUI. In a pretrial motion to suppress, Johonoson alleged, *inter alia*, that when the trooper pulled behind his vehicle and activated the patrol car's emergency lights, he was subjected to an investigatory detention without reasonable suspicion. The trial court denied the motion, and the Superior Court, in an alternative holding, affirmed. The court found that the fact that Johonoson had voluntarily pulled off the road and came to a full stop without any prompting from the trooper was critical to its determination. With respect to Johonoson's argument that the activated emergency lights were a signal that he was not free to leave,[6] thus rendering the interaction an investigative detention, the Superior Court stated:

---

[6] In *Johonoson*, the court opined that the "free to leave" test, discussed *infra*, was inapposite, and that the relevant inquiry was "whether a reasonable person would feel free to 'decline the officer's requests or otherwise terminate the encounter' once the officer approaches the driver and begins asking questions." 844 A.2d at 563 (citing *Commonwealth v. Smith*, 836 A.2d 5 (Pa. 2003)). Similarly, in *Conte*, the court determined that a reasonable person in the appellant's position "would have felt free to decline the officer's offer of help or to otherwise terminate the encounter," 931 A.2d at 694, but stated that the "same result would have attained under the 'free to leave' test . . . if appellant had introduced evidence . . . that an alternate ride awaited him" at the time the officer's patrol car arrived. *Id.* at n.3. However, our decision in *Smith*, wherein the defendant was approached by police officers while she was on a bus, simply recognized that, pursuant to *Florida v. Bostick*, 501 U.S. 429 (1991), the proper inquiry (continued…)

We recognize that flashing overhead lights, when used to pull a vehicle over, are a strong signal that a police officer is stopping a vehicle and that the driver is not free to terminate this encounter. The same is not necessarily true under the factual circumstances presented here. It is one traditional function of State Troopers, and indeed all police officers patrolling our highways, to help motorists who are stranded or who may otherwise need assistance. Such assistance is to be expected, and is generally considered welcome.

Often, and particularly at night, there is simply no way to render this aid safely without first activating the police cruiser's overhead lights. This act serves several functions, including avoiding a collision on the highway, and potentially calling additional aid to the scene. Moreover, by activating the overhead lights, the officer signals to the motorist that it is actually a police officer (rather than a potentially dangerous stranger) who is approaching.

By pulling over to the side of the road at 3:00 in the morning on a rural road, after driving slowly with his hazard lights on, Appellant should have had reason to expect that a police officer would pull over and attempt to render aid. Indeed, by his own repeated admissions, Appellant had recently been in a serious accident and was lost on a dark country road. Appellant is exactly the sort of person whom [the trooper] has a duty to assist. The fact that [the trooper] activated his lights in the course of doing so does not turn the interaction into an investigative detention. Rather, it remained a mere encounter for which no suspicion of illegal activity was required.

844 A.2d at 562 (emphasis omitted).

---

(…continued)
where an individual is approached in the confines of a bus is not whether a reasonable person would feel free to leave, as that belief might be the result of the individual's decision to board the bus for travel, rather than coercive conduct on the part of police, but rather whether, taking into account all of the circumstances surrounding the encounter, a reasonable person would have felt free to decline to answer an officer's questions.

In *Conte*, a police officer received a report of a disabled vehicle on the side of the road, and, upon seeing the vehicle, pulled behind it and activated his emergency lights. The officer then approached the driver, Conte, who had exited his vehicle, to ask if he needed help, and Conte indicated he had a flat tire. The officer noticed signs of intoxication, and Conte ultimately was arrested and charged with DUI. Conte filed a motion to suppress on the basis that the uniformed officer's arrival in his patrol car, with emergency lights flashing, instantly subjected him to an investigative detention unsupported by reasonable suspicion. The trial court denied the motion, and the Superior Court affirmed, quoting at length from *Johonoson*. The court determined that Conte was not subjected to an investigatory detention because "a reasonable person in [his] position would have understood [the officer's] arrival as an act of official assistance, and not as the start of an investigative detention." 931 A.2d at 693. The court further concluded that a reasonable person in Conte's position, "knowing the officer was simply carrying out a highly desirable public safety duty, would have felt free to decline the officer's offer of help or to otherwise terminate the encounter." *Id.* at 694.

Finally, in *Kendall*, two police officers were on routine patrol at approximately 1:15 a.m. when they came upon a vehicle traveling in front of them. After nearly two or three minutes, the driver, Kendall, activated his turn signal and pulled onto the shoulder of the two-lane road, leaving his turn signal on. The officers pulled behind the vehicle, and, after running the license plate, activated their emergency lights. One of the officers exited the patrol car and approached the driver's side of the vehicle, asking Kendall why he had pulled over suddenly. Kendall stated that he did so to let the patrol car pass. At this time, the officer observed an open can of beer on the passenger seat and smelled alcohol on the driver's breath, and Kendall was arrested and charged with DUI. He filed a pretrial motion to suppress the evidence on the grounds that he was subjected to an

investigatory detention without reasonable suspicion, which the trial court denied. On appeal, the Superior Court affirmed the trial court's denial of the motion to suppress, concluding that, in light of police officers' duty to render aid and assistance to motorists, the interaction between the officers and Kendall was a mere encounter, which required no level of suspicion. Citing *Conte* and *Johonoson*, the court reiterated that the activation of emergency lights does not transform a mere encounter into an investigatory detention. 975 A.2d at 505.

In the instant case, quoting at length from *Johonoson*, the Superior Court concluded that the record supported the trial court's conclusion that Trooper Frantz pulled his vehicle alongside Appellant's vehicle to see if she needed assistance. The court suggested that the "absence of outward signs of a vehicle being in distress does not bar an officer from conducting a safety check," and opined that, because "[d]rivers do not commonly stop their cars on an interstate at night, and doing so is generally associated with a motorist having some sort of problem," the circumstances were sufficient to suggest to Trooper Frantz that assistance might be needed. 1829 WDA 2014 at 8 (citing *Collins*, 950 A.2d at 1047).[7] Thus, the court determined that the

---

[7] In this regard, the Superior Court distinguished its decisions in *Commonwealth v. Hill*, 874 A.2d 1214 (Pa. Super. 2005), and *Commonwealth v. Fuller*, 940 A.2d 476 (Pa. Super. 2007). In *Hill*, a police officer was patrolling a rural road in the early morning when he observed a vehicle pull to the side of the road. The officer pulled his police cruiser behind the vehicle, activated his emergency lights, and approached the vehicle on foot, at which point he discovered that the driver, Hill, was intoxicated. The Superior Court held that Hill had been subjected to an investigative detention without reasonable suspicion because, unlike in *Johonoson*, there were no circumstances that would lead a reasonable person to believe that the officer had pulled behind Hill with his emergency lights activated in order to render assistance.

Similarly, in *Fuller*, police officers were traveling in their police cruiser shortly after midnight when they caught up to a truck traveling in the same direction. The driver, Fuller, slowed down to an approximate stop, and then pulled onto the berm of the road. The officers pulled their police vehicle behind the truck and activated their emergency lights. One of the officers approached Fuller on foot, and noticed signs of (continued…)

interaction between Appellant and Trooper Frantz constituted a mere encounter and thus did not require reasonable suspicion of criminal activity. *Livingstone*, at 6.

Appellant filed a petition for allowance of appeal with this Court, and we granted review to consider the following issue: "Where a Police Officer approaches a voluntarily stopped motorist with [the police vehicle's] emergency lights activated, would a reasonable motorist feel that she was not free to leave prior to the approaching officer stopping to interact with her, or, simply passing her by?" *Commonwealth v. Livingstone*, 135 A.3d 1016 (Pa. 2016) (order). We specifically directed the parties to address the potential application of a community caretaking exception, *see*, *e.g.*, *State v. Anderson*, 362 P.3d 1232 (Utah 2015) (holding that seizure of defendant who had stopped his car on the side of a rural highway at night and activated his vehicle's hazard lights was justified under the public servant exception to the community caretaking doctrine), under these circumstances.

## II. Analysis

As Appellant challenges the Superior Court's decision affirming the trial court's denial of her motion to suppress, we first note our well established standard of review of claims regarding the denial of a suppression motion:

---

(…continued)
intoxication. When asked why he had pulled off the road, Fuller replied "because you guys were behind me." 940 A.2d at 477. The Superior Court vacated Fuller's sentence, holding that he had been subjected to an investigative detention without reasonable suspicion; the court noted that the officer who stopped Fuller testified that the officer believed the activation of the emergency lights was a signal to the motorist that he was not free to leave and that the officer agreed that Fuller would interpret the lights in the same manner.

In the instant case, the Superior Court noted that, in *Fuller* and *Hill*, the officers initially witnessed the motorists driving on the road and did not observe anything that would suggest that the motorists needed assistance, whereas in the instant case, Appellant's vehicle was "parked" on an interstate at night, which is "unusual." *Livingstone*, 1829 WDA 2014 at 7.

> We may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. An appellate court, of course, is not bound by the suppression court's conclusions of law.

*Commonwealth v. Gary*, 91 A.3d 102, 106 (Pa. 2014) (citation omitted). In reviewing questions of law, our standard of review is *de novo* and our scope of review is plenary. *Weaver v. Lancaster Newspapers, Inc.*, 926 A.2d 899, 903 (Pa. 2007).

## A. Seizure vs. Mere Encounter

In arguing that the Superior Court erred in affirming the trial court's denial of her motion to suppress, Appellant maintains that, at the moment Trooper Frantz pulled alongside her stopped vehicle, with his emergency lights activated, she was subjected to an investigative detention that was not supported by reasonable suspicion or probable cause, thus violating her right to be free from unreasonable searches and seizures under the Fourth Amendment to the United States Constitution.[8] In its brief, the Commonwealth asserts that the "initial interaction between Trooper Frantz and Appellant was a mere encounter," Commonwealth Brief at 2, but devotes its argument and analysis to whether Trooper Frantz's stop of Appellant was justified under the community caretaking doctrine. For the following reasons, we are constrained to agree with Appellant that, when Trooper Frantz pulled alongside her vehicle, with his emergency lights activated, Appellant was subjected to an investigative detention.

---

[8] Although Appellant also cites Article I, Section 8 of the Pennsylvania Constitution, she does not contend that the Pennsylvania Constitution provides any greater privacy protection under the facts of this case than does the Fourth Amendment, nor does she cite any cases for such a proposition. Thus, we analyze this case purely under the federal Constitution.

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

The United States Constitution does not forbid all searches and seizures; rather, it forbids *unreasonable* searches and seizures. *Terry*, 392 U.S. at 9. A determination of whether a search is reasonable requires balancing the public interest in conducting the search or seizure against an individual's right to be free from arbitrary intrusions by law enforcement officers. *Id.* at 20-21. Furthermore, in the context of the Fourth Amendment, a person is considered seized "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). In evaluating those circumstances, the crucial inquiry is whether the officer, "by means of physical force or a show of authority," has restrained a citizen's freedom of movement. *Id.* at 553; *Strickler*, 757 A.2d at 890.

As a preliminary matter, we emphasize that the issue of whether an individual has been seized is distinct from the issue of whether that seizure was reasonable. The fact that a search may be deemed reasonable pursuant to an "exception"[9] to the warrant requirement does not mean that the individual was not subjected to a seizure in the first instance. For example, in the context of the community caretaking doctrine exception to the warrant requirement, the Supreme Court of Illinois explained, "if community caretaking were just another name for consensual encounters, there would

_____

[9] *See* note 11, *infra*.

have been no need for courts to formulate the exception in the first place." *People v. McDonough*, 940 N.E.2d 1100, 1107 (Ill. 2010) ("[T]he community caretaking doctrine 'is analytically distinct from consensual encounters and is invoked to validate a search or seizure as reasonable under the [F]ourth [A]mendment. *It is not relevant to determining whether police conduct amounted to a seizure in the first place*." (emphasis original)); *see also State v. McCormick*, 494 S.W.3d 673, 675 (Tenn. 2016) ("[T]he community caretaking doctrine is analytically distinct from consensual police-citizen encounters and is instead an exception to the state and federal constitutional warrant requirements which may be invoked to validate as reasonable a warrantless seizure of an automobile."); *State v. Crawford*, 659 N.W.2d 537, 543 (Iowa 2003) ("Implicit in any community caretaking case is the fact that there has been a seizure within the meaning of the Fourth Amendment. Otherwise there would be no need to apply a community caretaking exception.").

As noted above, the trial court in the instant case concluded that "Trooper Frantz was under a duty to determine whether [Appellant] needed assistance," such that Trooper Frantz's "act of approaching [Appellant's] vehicle with his overhead emergency lights was a mere encounter." Trial Court Opinion, 6/18/14, at 4-5 (citing *Conte*, *supra* and *Kendall*, *supra*). Moreover, in affirming the trial court's order, the Superior Court held that the trial court's determination that Trooper Frantz pulled alongside Appellant's vehicle in order to conduct a "safety check" was supported by the record, and, therefore, that the interaction was a mere encounter. *Livingstone*, 1829 WDA 2014 at 7, 10. In focusing on whether Trooper Frantz had a duty to determine whether Appellant was in need of assistance, and whether it was reasonable for him to conclude that she might, the lower courts conflated the threshold issue of whether Appellant was seized − i.e., whether a reasonable person in Appellant's shoes would have believed that she was

free to leave − with the issue of whether the seizure was reasonable.[10] Thus, we must first determine whether Appellant was seized by considering whether a reasonable person in Appellant's shoes would have believed she was free to leave when Trooper Frantz pulled his patrol car, with its emergency lights activated, alongside her vehicle.

To determine whether a citizen's movement has been restrained, courts must consider the totality of the circumstances, "with no single factor dictating the ultimate conclusion as to whether a seizure has occurred." *Strickler*, 757 A.2d at 890. In *Mendenhall*, the high Court indicated that the following factors suggest a seizure occurred: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." 446 U.S. at 554. The Court explained that, absent evidence of the factors identified

---

[10] We note that, in the cases relied on by the Superior Court below, including *Johonoson*, *Conte*, and *Kendall*, the courts' decisions likewise were based in part on its belief that the motorists should have expected that a police officer might approach them and attempt to render aid. In *Johonoson*, the court opined, "[b]y pulling over to the side of the road at 3:00 in the morning on a rural road, after driving slowly with his hazard lights on, Appellant should have had reason to expect that a police officer would pull over and attempt to render aid." 844 A.2d at 562. In *Conte*, the court similarly held "[t]he evidence introduced at the suppression hearing shows that a reasonable person in Appellant's position would have understood [the officer's] arrival as an act of official assistance, and not as the start of an investigative detention." 931 A.2d at 693. In *Kendall*, the Superior Court stated:

> While we have held that the applicable standard in determining whether an interaction rises to the level of an investigative detention hinges on whether "a reasonable person believe[s] he was not free to go and was subject to the officer's orders," this should not be the only standard in situations like the one at hand. . . . It has been suggested in case law that this determination might turn on whether the driver had reason to believe that that officer is simply carrying out his duty to render aid.

976 A.2d at 508.

above, "otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." *Id.* at 555.

Similarly, in *Commonwealth v. Jones*, this Court explained that, in order to determine when a "stop" has occurred, "subtle factors as the demeanor of the police officer, the location of the confrontation, the manner of expression used by the officer in addressing the citizen, and the content of the interrogatories or statements," must be considered. 378 A.2d 835, 839-40 (Pa. 1977) (recognizing that, while a police uniform is a symbol of authority, a uniform is not, in and of itself, a sufficient exercise of force to render an interaction between an officer and a citizen a "stop"). The pivotal inquiry is whether, in light of the facts and circumstances identified above, "a reasonable man, innocent of any crime, would have thought (he was being restrained) had he been in the defendant's shoes." *Id.* at 840 (citation omitted). The *Jones/Mendenhall* standard has been consistently followed in Pennsylvania in determining whether the conduct of the police amounts to a seizure, or whether there is simply a mere encounter between citizen and police officer. *Commonwealth v. Matos*, 672 A.2d 769, 774 (Pa. 1996).

It is undeniable that emergency lights on police vehicles in this Commonwealth serve important safety purposes, including ensuring that the police vehicle is visible to traffic, and signaling to a stopped motorist that it is a police officer, as opposed to a potentially dangerous stranger, who is approaching. *See Johonoson*, 844 A.2d at 562. Moreover, we do not doubt that a reasonable person may recognize that a police officer might activate his vehicle's emergency lights for safety purposes, as opposed to a command to stop. Nevertheless, upon consideration of the realities of everyday life, particularly the relationship between ordinary citizens and law enforcement, we simply cannot pretend that a reasonable person, innocent of any crime, would not interpret the

activation of emergency lights on a police vehicle as a signal that he or she is not free to leave.

Indeed, the Pennsylvania Driver's Manual ("PDM") instructs drivers how to proceed "if [they] are stopped by police." The PDM first provides: "You will know a police officer wants you to pull over when he or she activates the flashing red and blue lights on top of the police vehicle." Pa. Driver's Manual at 78, *available at* http://www.dot.state.pa.us/Public/DVSPubsForms/BDL/BDLManuals. The PDM further "recommends" that drivers follow certain procedures "[a]nytime a police vehicle stops behind you." *Id.* Those procedures include turning off the engine and radio, rolling down a window to enable communication with the officer, limiting their movements and the movements of passengers; placing their hands on the steering wheel; keeping the vehicle doors closed and remaining inside the vehicle; and keeping their seatbelt fastened. *Id.* If these instructions do not explicitly instruct motorists who are already stopped on the side of the road that they are not free to leave when a police vehicle, with its emergency lights activated, pulls alongside their vehicle, we conclude that it is eminently reasonable that a motorist would believe he or she is not free to leave under these circumstances.

Moreover, pursuant to Pennsylvania's Motor Vehicle Code, a driver of a motor vehicle "who willfully fails or refuses to bring his vehicle to a stop, or who otherwise flees or attempts to elude a pursuing police officer, when given a visual and audible signal to bring the vehicle to a stop," may be convicted of a second-degree misdemeanor. 75 Pa.C.S. § 3733(a), (a.2). A police officer's signal may be "by hand, voice, emergency lights or siren." *Id.* § 3733(b). Section 3325(a) of the Motor Vehicle Code, titled "Duty of driver on approach of emergency vehicle," similarly provides:

> **(a) General rule.**--Upon the immediate approach of an emergency vehicle making use of an audible signal and

> visual signals meeting the requirements and standards set forth in regulations adopted by the department, the driver of every other vehicle shall yield the right-of-way and shall immediately drive to a position parallel to, and as close as possible to, the right-hand edge or curb of the roadway clear of any intersection *and shall stop and remain in that position until the emergency vehicle has passed,* except when otherwise directed by a police officer or an appropriately attired person authorized to direct, control or regulate traffic.

*Id.* § 3325(a) (emphasis added).

The fact that motorists risk being charged with violations of the Motor Vehicle Code if they incorrectly assume they are free to leave after a patrol car, with its emergency lights activated, has pulled behind or alongside of them further supports our conclusion that a reasonable person in Appellant's shoes would not have felt free to leave.

The appellate courts of many of our sister states have reached the same conclusion. For example, in *State v. Morris*, 72 P.3d 570 (Kan. 2003), an undercover officer observed Morris sitting in a parked pick-up truck, with the engine running, on a rocky jetty-breaker area at a lake. The officer had seen Morris earlier in the day while conducting surveillance of an apartment building as part of an investigation of a possible methamphetamine lab. Upon seeing Morris in his parked truck, the undercover officer radioed for two additional officers, who arrived in a marked police vehicle. By the time the two officers arrived, Morris had turned off the engine, and the officers pulled their vehicle behind the truck, activated their emergency lights, and illuminated the back of the truck with spotlights. The three officers approached the truck, requested Morris' identification, and, upon noticing a chemical odor from the truck, asked Morris to exit the truck. A search of the truck revealed materials used in the manufacturer of methamphetamine. Morris filed a pretrial motion to suppress the evidence, and, although he did not raise the precise argument that he was subjected to an unlawful

investigative detention when the officers pulled up behind him and activated their emergency lights, the Kansas Supreme Court nevertheless addressed the issue:

> The officers' conduct, the activation of the emergency lights in a remote area off a roadway, was a show of authority which would communicate to a reasonable person that there was an intent to intrude upon freedom of movement. "Few, if any, reasonable citizens, while parked, would simply drive away and assume that the police, in turning on the emergency flashers, would be communicating something other than for them to remain." *Lawson v. State*, [707 A.2d 947 (Md. App. 1998)]. In fact, it is unlawful for a driver to fail to stop when a police officer signals the driver by using emergency lights. K.S.A. 8-1568 (fleeing and eluding).

72 P.3d at 577.

In *State v. Anderson*, *supra*, the Utah Supreme Court suggested that even where the circumstances would suggest that police assistance was needed or welcomed, a seizure occurs if a reasonable person in the motorist's shoes would not feel free to leave after being approached by a police vehicle with its emergency lights activated. The defendant, Anderson, had stopped his car on the side of a rural highway on a cold December evening, and turned on the vehicle's hazard lights. Two county deputies noticed the vehicle as they drove down the highway. Due to the late hour, cold weather, and hazard lights, the deputies pulled their patrol car behind the defendant's, and activated their red and blue emergency lights. The deputies approached Anderson on foot, asked him to exit his car, and ultimately discovered marijuana and drug paraphernalia in his vehicle. Prior to trial, Anderson sought to suppress evidence of the drugs and paraphernalia on the basis that he had been subjected to an investigative detention unsupported by reasonable suspicion when the deputies pulled their police cruiser with its lights activated behind his parked vehicle; the motion was denied and Anderson was convicted.

On appeal, the Utah Supreme Court first examined whether Anderson had been seized for purposes of the Fourth Amendment, which the Court noted required a determination as to "whether a reasonable person parked on the side of an empty highway at night would believe that she was free to leave if a police vehicle with its red and blue overhead lights engaged pulled over directly behind her car." 362 P.3d at 1235-36. The high Court acknowledged the State's argument that "a police vehicle's overhead lights are not always used as a show of authority," and "may be used for officer or public safety and to convey to the occupants of a vehicle that the approaching officer does not present a threat." *Id.* at 1236. However, in response to the State's contention that, under the circumstances, a reasonable motorist would know that the police officer was using the overhead lights for safety purposes and not a show of authority, the high Court explained:

> Even though we may presume that a reasonable person knows that police officers may use their overhead lights for reasons other than as a command to stop, that does not mean that the average motorist [who was parked on the side of an empty highway at night when a police vehicle with its emergency lights activated pulled directly behind her] would assume that the officers had no interest in detaining the vehicle and would feel free to drive away. At best, the use of a police vehicle's overhead lights while pulling behind a car parked on the side of the road is ambiguous. The lights may signal the presence of a police vehicle for safety reasons, or they may convey the message that the officers wish to seize the vehicle parked in front of them. Faced with this ambiguity, "[f]ew, if any, reasonable citizens, while parked, would simply drive away" upon an assumption that the police did not wish to detain them. *Morris*, 72 P.3d at 577 (citation omitted). The consequences of wrongly guessing the officer's intent in engaging the overhead lights and driving away could, in theory, be severe. Attempting "to flee or elude a peace officer" after receiving "a visual or audible signal from a peace officer to bring the vehicle to a stop" is a third-degree felony. Utah Code § 41–6a–210(1). The potential of even being accused of a felony would constrain a reasonable motorist from driving away under the facts of this

case. *See Morris,* 72 P.3d at 577 (citing Kansas's fleeing-an-officer statute as a reason why a reasonable person would not feel free to leave); *Lawson v. State,* 120 Md.App. 610, 707 A.2d 947, 951 (1998) (citing a Maryland statute for the same purpose).

*Id.*

Numerous other jurisdictions, including Arkansas, California, Connecticut, Florida, Idaho, Maryland, Montana, North Dakota, Oregon, Tennessee, Vermont, Virginia, Washington, and Wyoming, have likewise concluded that a seizure occurs when a police officer pulls his police vehicle, with its emergency lights activated, behind a parked or stopped vehicle. *See Hammons v. State,* 940 S.W.2d 424, 428 (Ark. 1997) (defendant sitting in parked car was seized when police activated blue light; light was display of authority that would indicate to reasonable person he was not free to leave); *People v. Brown*, 353 P.2d 305, 312 (Cal. 2015) (defendant sitting in parked car was seized when officer pulled his patrol car behind the defendant's car and activated his overhead emergency lights because a reasonable person in defendant's position would have perceived the actions as a show of authority requiring that he submit by remaining where he was); *State v. Donahue,* 742 A.2d 775, 780 (Conn. 1999) (defendant was seized when officer pulled behind his parked vehicle and activated the patrol car's red, yellow, and blue flashing lights); *Smith v. State*, 87 So.3d 84, 88 (Fla. Dist. Ct. App. 4th 2012) (defendant sitting in vehicle that was legally parked on the side of a residential street was seized when a police officer pulled diagonally to defendant's vehicle and activated his emergency lights and spotlight because defendant would not have felt free to leave); *State v. Mireles*, 991 P.2d 878, 880 (Idaho Ct. App. 1999) (officer's act of activating emergency lights, although not necessarily intended to create a detention, constituted a technical, *de facto* detention commanding the defendant to remain stopped under state statute, such that he would not have believed he was free to leave); *Lawson v. Maryland,* 707 A.2d 947, 951 (Md. App. 1998) (defendant in parked car was

seized when police activated emergency lights because activation of the emergency lights was a show of authority that would communicate to a reasonable person that he was not free to move away); *State v. Graham*, 175 P.3d 885, 889 (Mont. 2007) (defendant who was sitting in his parked truck on a dirt pullout was seized when deputy pulled her patrol car behind the truck and activated her emergency lights because a reasonable person would not have felt free to leave); *State v. Thompson*, 793 N.W.2d 185, 187 (N.D. 2011) (defendant who pulled into a parking spot was seized when police officer stopped directly behind the defendant's vehicle and activated his patrol car's emergency lights because a reasonable person would not believe he was free to leave under such circumstances); *State v. Walp,* 672 P.2d 374, 375 (Or. App. 1983) (use of emergency lights after defendant had stopped car on his own accord was sufficient show of authority and a reasonable person would not have felt free to leave); *State v. Pulley*, 863 S.W.2d 29, 30 (Tenn. 1993) (defendant sitting in parked car at gas station was seized when police officer pulled his patrol car behind him and activated his blue lights); *State v. Burgess,* 657 A.2d 202, 203 (Vt. 1995) (defendant sitting in vehicle with engine running and parking lights on in lawful pull-off area was subjected to seizure when officer pulled his patrol car behind the defendant's vehicle and activated his blue lights, even if officer subjectively intended to activate his blue lights for safety reasons); *Wallace v. Commonwealth*, 528 S.E.2d 739, 741-42 (Va. App. 2000) (driver of vehicle parked in driveway was seized when police officer parked his patrol car behind him and activated its emergency lights because a reasonable person would not have felt free to leave); *State v. Stroud,* 634 P.2d 316, 318 (Wash. App. 1981) (occupants of parked vehicle were seized when officers pulled up behind them and activated patrol car's emergency lights and headlights because such action constituted a show of authority sufficient to convey to any reasonable person that he or she was not free to leave, and

risked being charged with misdemeanor if he or she tried to do so); *McChesney v. State*, 988 P.2d 1071, 1075 (Wyo. 1999) (where police vehicle with its emergency lights activated pulled behind a vehicle that had turned into a parking lot, defendant was seized for purposes of Fourth Amendment because a reasonable person would not have believed he was free to leave, particularly where state statute prohibited a driver from attempting to elude a police vehicle after being given a "visual or audible signal to bring the vehicle to a stop").

As we conclude that a reasonable person in Appellant's shoes would not have felt free to leave after Trooper Frantz pulled his patrol car, with its emergency lights activated, alongside her vehicle, we are constrained to hold that Appellant was seized and subjected to an investigative detention. Given that it is undisputed that the seizure was not supported by any degree of suspicion of criminal activity, we will proceed to determine whether it was otherwise justified under the Fourth Amendment.

### B. The Community Caretaking Doctrine

In order to protect individuals against unreasonable searches and seizures, a right guaranteed by the Fourth Amendment, law enforcement generally must obtain a warrant prior to conducting a search: "A search warrant indicates that the police have convinced a neutral magistrate upon a showing of probable cause, which is a reasonable belief, based on the surrounding facts and totality of circumstances, that an illegal activity is occurring or evidence of a crime is present." *Commonwealth v. Petroll*, 738 A.2d 993, 998 (Pa. 1999). Further, "a search without a warrant may be proper where an exception applies and the police have probable cause to believe a crime has been or is being committed." *Id.* at 999 (citing, *inter alia*, *Commonwealth v. Riedel,* 651 A.2d 135, 139 & n.1 (Pa. 1994) (noting that exceptions include actual consent, implied consent, search incident to arrest, and exigent circumstances)). Moreover, some

warrantless searches have been held not to violate state or federal constitutional privacy rights, even absent probable cause, for officer safety or administrative reasons. *See Petroll*, 738 A.2d at 999 (citing *Commonwealth v. Morris*, 644 A.2d 721 (Pa. 1994) (protective search); *Colorado v. Bertine*, 479 U.S. 367, 371–72 (1987) (inventory search); *New York v. Burger*, 482 U.S. 691, 702-03 (1987) (administrative search of a closely regulated business)).

The Commonwealth maintains that, even if Appellant was subjected to a seizure, that seizure was reasonable under the community caretaking "exception" to the Fourth Amendment's warrant requirement.[11] Appellant, conversely, argues that application of the doctrine is not supported under the facts of this case. The United States Supreme Court first recognized a community caretaking exception to the warrant requirement in *Cady v. Dombrowski*, 413 U.S. 433 (1973). Therein, the Court considered whether police officers violated a vehicle owner's Fourth Amendment rights when, without obtaining a warrant, they searched the trunk of a parked vehicle because they reasonably believed that the trunk contained a loaded service revolver that could endanger the public if left unsecured. The vehicle owner had been arrested one day earlier for drunk driving and identified himself as a police officer. In determining that the search of the trunk was reasonable, the Court observed that police officers "frequently

---

[11] In referring to circumstances in which a warrantless search will be deemed reasonable absent probable cause, courts often use the phrase "exception to the warrant requirement," *see*, *e.g.*, *Bertine*, 479 U.S. at 371 ("inventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment"). In our view, this is somewhat of a misnomer, as use of the phrase "exception to the warrant requirement" suggests that a warrant generally would be required; yet, as we discuss below, a search conducted under the community caretaking doctrine, when viewed objectively, must be independent from the investigation of criminal activity, and thus, in such circumstances, there would be no basis upon which to obtain a warrant in the first instance. Nevertheless, as most courts characterize the community caretaking doctrine as an "exception" to the warrant requirement, we will occasionally employ that language as well.

investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* at 441. The high Court further opined that, "[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable." *Id.* at 447.

The community caretaking doctrine has been characterized as encompassing three specific exceptions: the emergency aid exception; the automobile impoundment/inventory exception; and the public servant exception, also sometimes referred to as the public safety exception. *See State v. Ryon*, 108 P.3d 1032, 1042 (N.M. 2005) (community caretaker exception encompasses three distinct doctrines: the emergency aid doctrine, the automobile impoundment and inventory doctrine, and the public servant doctrine); *State v. Acrey*, 64 P.3d 594, 600 (Wash. 2003) (*en banc*) (community caretaking function exception to the warrant requirement encompasses not only search and seizure of automobiles, but also situations involving either emergency aid or routine checks on health and safety); *State v. Kurth*, 813 N.W. 2d 270, 277 (Iowa 2012) (community caretaking activity consists of three subcategories: the emergency aid exception, the automobile impoundment/inventory exception, and the public servant exception noted in *Cady*, *supra*).

Each of the exceptions contemplates that the police officer's actions be motivated by a desire to render aid or assistance, rather than the investigation of criminal activity. *See Ryon*, 108 P.3d at 1043 ("The common characteristic of [the three exceptions of the community caretaking doctrine] is that the intrusion upon privacy occurs while police are acting as community caretakers; their actions are motivated by 'a desire to aid victims rather than investigate criminals.'"); *Corbin v State*, 85 S.W.3d

272, 277 (Tex. Crim App. 2002) ("[A] police officer may not properly invoke his community caretaking function if he is primarily motivated by a non-community caretaking purpose."); *Commonwealth v. Waters*, 456 S.E.2d 527, 530 (Va. Ct. App. 1995) ("[n]o seizure, however limited, is a valid exercise of the community caretaking function if credible evidence indicates that the stop is a pretext for investigating criminal activity.").

In *Commonwealth v. Laganella*, 83 A.3d 94, 103 (Pa. 2013), this Court acknowledged the "community care-taking functions" of police when we considered the legality of an inventory search of a vehicle lawfully impounded pursuant to standard police policy. We have not, however, addressed the public servant or the emergency aid exceptions under the community caretaking doctrine, although more than half of our sister states have done so.[12]  *See People v. Ray*, 981 P.2d 929, 931 (Cal. 1999)

---

[12]  In *Commonwealth v. Davido*, 106 A.3d 611 (Pa. 2014), we determined that police officers' warrantless entry into a home where a domestic disturbance had been reported was justified pursuant to "exigent circumstances" because the police received no response when they knocked and reasonably inferred that someone inside was in need of emergency assistance. However, the exigent circumstances exception is distinct from the emergency aid exception that falls under the community caretaking doctrine. As the California Supreme Court aptly explained:

> [T]he emergency aid doctrine is not a subcategory of the exigent circumstances exception to the warrant requirement. Rather, it is a subcategory of the community caretaking exception, a distinctly different principle of Fourth Amendment jurisprudence. "When the police act pursuant to the exigent circumstances exception, they are searching for evidence or perpetrators of a crime. Accordingly, in addition to showing the existence of an emergency leaving no time for a warrant, they must also possess probable cause that the premises to be searched contains such evidence or suspects. In contrast, the community caretaker exception is only invoked when the police are not engaged in crime-solving activities." With respect to Fourth Amendment guaranties, this is the key distinction: "the defining characteristic of community caretaking functions is that they

(continued…)

(warrantless entry into home justified under emergency aid exception); *Williams v. State,* 962 A.2d 210, 216 (Del. 2008) (approach and questioning of defendant walking on highway median was not a seizure, and, even if it was, seizure was justified under public safety exception); *Hawkins v. United States*, 113 A.3d 216, 221–22 (D.C. 2015) (warrantless entry into idling car justified under public safety exception); *State v. Maddox*, 54 P.3d 464, 467 (Idaho 2002) (detention of motorist driving off-road not justified under public safety doctrine); *People v. McDonough*, 940 N.E.2d 1100, 1109 (Ill. 2010) (police officers' approach of vehicle stopped on shoulder of highway at night justified under public safety exception); *Kurth,* 813 N.W.2d at 278 (Iowa court holding detention not justified under public servant exception); *State v. Neighbors*, 328 P.3d 1081, 1089-90 (Kan. 2014) (initial warrantless entry into apartment justified under emergency aid exception); *Poe v. Commonwealth*, 169 S.W.3d 54, 58 (Ky. Ct. App. 2005) (rejecting application of public safety exception under facts of the case); *State v. Pinkham*, 565 A.2d 318, 320 (Me. 1989) (warrantless entry may be justified by "safety reasons"); *Wilson v. State*, 975 A.2d 877, 891 (Md. 2009) (seizure not justified under public servant exception); *Commonwealth v. Fisher*, 13 N.E.3d 629, 632–34 (Mass. App. Ct. 2014) (warrantless seizure of individual in vehicle justified under public servant exception); *People v. Slaughter*, 803 N.W.2d 171, 180 (Mich. 2011) (community caretaking doctrine applies to firefighters); *Trejo v. State*, 76 So.3d 684, 689 (Miss.

---

(…continued)
> are totally unrelated to the criminal investigation duties of the police."

*Ray*, 981 P.2d at 933 (internal citations omitted). Nevertheless, we acknowledge that we have, on occasion, conflated the two concepts. *See Commonwealth v. Miller*, 724 A.2d 895, 900 (Pa. 1999) (holding that trial court's finding of "exigent circumstances" was supported by the record and justified warrantless entry into house, despite trial court's finding that police "were not investigating a crime, but rather, were responding to requests from concerned family members").

2011) (under facts of case, vehicle stop not justified under public servant exception); *State v. Graham*, 175 P.3d at 890 (Montana) (seizure not justified under public safety exception); *State v. Bakewell*, 730 N.W.2d 335, 338 (Neb. 2007) (vehicle stop justified under public servant exception); *State v. Rincon*, 147 P.3d 233, 237 (Nev. 2006) (recognizing community caretaking exception); *State v. Boutin*, 13 A.3d 334, 337–38 (N.H. 2010) (under facts of case, seizure not justified under public servant exception); *State v. Vargas*, 63 A.3d 175, 177 (N.J. 2013) (warrantless entry into defendant's apartment not justified by emergency aid exception); *Ryon*, 108 P.3d at 1041 (New Mexico) (holding warrantless entry into defendant's home not justified under emergency aid exception); *State v. Smathers*, 753 S.E.2d 380, 382 (N.C. Ct. App. 2014) (formally recognizing community caretaking doctrine); *State v. Dunn*, 964 N.E.2d 1037, 1042 (Ohio 2012) (seizure of individual justified under emergency aid exception); *State v. Kleven*, 887 N.W.2d 740, 743 (S.D. 2016) (seizure justified under public servant exception); *State v. McCormick*, 494 S.W.3d 673, 686 (Tenn. 2016) (seizure justified under public servant exception); *Hernandez v. State*, 376 S.W.3d 863, 877 (Tex. Ct. App. 2012) (seizure not justified under public servant exception); *Anderson*, 362 P.3d at 1240 (Utah) (holding seizure justified under public servant exception); *State v. Hinton*, 112 A.3d 770, 773 (Vt. 2014) (seizure justified under public servant exception); *Knight v. Commonwealth*, 734 S.E.2d 716, 721 (Va. Ct. App. 2012) (community caretaking doctrine did not justify police officer's search of defendant's backpack); *Acrey*, 64 P.3d at 603 (Washington) (holding detention of juvenile justified under community caretaking doctrine); *Ullom v. Miller*, 705 S.E.2d 111, 121 (W. Va. 2010) (seizure justified under public safety exception); *State v. Kramer*, 759 N.W.2d 598, 605 (Wis. 2009) (seizure justified under public servant exception); *Morris v. State*, 908 P.2d 931, 935 (Wyo. 2005) (search of defendant's wallet not justified under public servant exception).

The Supreme Court of Delaware described the basis for the community caretaking doctrine as follows:

> The modern police officer is a "jack-of-all-emergencies," with "'complex and multiple tasks to perform in addition to identifying and apprehending persons committing serious criminal offenses'; by default or design he is also expected 'to aid individuals who are in danger of physical harm,' 'assist those who cannot care for themselves,' and 'provide other services on an emergency basis.'" To require reasonable suspicion of criminal activity before police can investigate and render assistance in these situations would severely hamstring their ability to protect and serve the public.

*Williams*, 962 A.2d at 216-17 (internal citations and footnote omitted).

Similarly, the Tennessee Supreme Court observed that the "widespread adoption of the community caretaking doctrine as an exception to the warrant requirement reflects the reality that modern society expects police officers to fulfill various responsibilities," noting:

> Police officers wear many hats: criminal investigator, first aid provider, social worker, crisis intervener, family counselor, youth mentor and peacemaker, to name a few. They are charged with the duty to protect people, not just from criminals, but also from accidents, natural perils and even self-inflicted injuries. We ask them to protect our property from all types of losses—even those occasioned by our own negligence. They counsel our youth. They quell disputes between husband and wife, parent and child, landlord and tenant, merchant and patron and quarreling neighbors. Although they search for clues to solve crime, they also search for missing children, parents, dementia patients, and occasionally even an escaped zoo animal. They are society's problem solvers when no other solution is apparent or available.

*McCormick*, 494 S.W.3d at 683 (citation omitted).

This Court likewise recognizes that the role of police is not limited to the detection, investigation, and prevention of criminal activity. Rather, police officers engage in a myriad of activities that ensure the safety and welfare of our Commonwealth's citizens. Indeed, we want to encourage such laudable activity. However, even community caretaking activity must be performed in accordance with Fourth Amendment protections. Ultimately, we agree that the public servant exception may be employed consistent with these protections.

In recognition of the overarching requirements of the Fourth Amendment, courts have adopted a variety of tests for determining whether the public servant exception justifies a warrantless search or seizure. In *Anderson, supra*, the Utah Supreme Court opined that the same balancing test used in determining whether a seizure is reasonable under the Fourth Amendment − balancing an individual's interest in being free from police intrusion and the State's legitimate interest in the public welfare − is applicable to determining whether a seizure is justified pursuant to the community caretaking doctrine, and instructed:

> In applying this balancing test in the context of a community caretaking stop, courts must first evaluate the degree to which an officer intrudes upon a citizen's freedom of movement and privacy. In doing so, courts should look to both "the degree of overt authority and force displayed" in effecting the seizure, and the length of the seizure. Second, courts must determine whether "the degree of the public interest and the exigency of the situation" justified the seizure for community caretaking purposes. In other words, how serious was the perceived emergency and what was the likelihood that the motorist may need aid? If the level of the State's interest in investigating whether a motorist needs aid justifies the degree to which an officer interferes with the motorist's freedoms in order to perform this investigation, the seizure is not "unreasonable" under the Fourth Amendment.

362 P.3d at 1239 (internal citations omitted).

Applying this test, the *Anderson* court first concluded that police officers' "seizure" of a motorist who was in a parked car on the side of a highway, at night and in below-zero temperatures, with his vehicle's hazard lights on, was "minimally invasive" of the motorist's right to be free from arbitrary interferences by police because (1) the vehicle was parked, not traveling down the highway; (2) there was no unduly excessive display of authority or force, in that the only show of authority was the trooper's use of his overhead flashing lights and he did not draw his weapon or shout commands; and (3) the officers detained the motorist only long enough to approach his vehicle and ask whether he needed aid. *Id.* at 1239-40. With regard to the second inquiry − the seriousness of the perceived emergency and the likelihood that the motorist needed aid − the court opined that a "reasonable officer would have cause to be concerned about the welfare of a motorist [who was] parked on the side of a highway with his hazard lights flashing just before 10:00 p.m." in very cold temperatures. *Id.* at 1240. Accordingly, the court held that the seizure was justified under the community caretaking doctrine. *Id.*

Wisconsin also has adopted a balancing test to determine whether an officer's actions are reasonable under the community caretaker function, balancing the "public interest or need that is furthered by the officer's conduct against the degree of and nature of the restriction upon the liberty interest of the citizen." *Kramer*, 759 N.W.2d at 610. The stronger the public need and the more minimal the intrusion upon the individual's liberty, the more likely the police action will be deemed reasonable. *Id.* at 611. The Wisconsin Supreme Court has cited the following factors as relevant in assessing the balance between the public interest and a citizen's liberty interest:

> (1) the degree of the public interest and exigency of the situation; (2) the attendant circumstances surrounding the seizure, including time, location, the degree of overt authority and force displayed; (3) whether an automobile is involved;

and (4) the availability, feasibility and effectiveness of alternatives to the type of intrusion actually accomplished.

*Id.*

After considering the above factors, the court in *Kramer* determined that a police officer's act of pulling behind a vehicle that was legally parked on the side of the road at night with its hazard lights activated, and the officer's activation of his own emergency lights, was reasonable under the community caretaker function because (1) the public has an interest in ensuring that police assist motorists who may be stranded, particularly at night; (2) the degree of overt authority was slight, as the officer's use of his emergency lights was for safety purposes, as was his act of pulling behind the driver's vehicle as opposed to beside it, which would have blocked a lane of traffic; (3) an automobile was involved; and (4) if the driver was ill, a delay in help may have been fatal, and if the driver's vehicle was not working, the driver may have attempted to walk along the highway, putting himself in danger. *Id.* at 611-12.

This balancing test is also used in Illinois. In *McDonough*, the Illinois Supreme Court explained that, in determining whether a seizure is justified under the community caretaker exception, it "must balance a citizen's interest in going about his or her business free from police interference against the public's interest in having police officers perform services in addition to strictly law enforcement." 940 N.E.2d at 1109. In concluding that a police officer's approach of a motorist's car, which was pulled to the side of a four-lane highway at night, was justified under the community caretaker exception, the court noted that the public has an interest in ensuring that police officers offer assistance to stranded motorists; the highway was busy; and the officer activated his emergency lights because it was dark and there was a lot of traffic. *Id.* at 1109-10.

While the above courts utilize a balancing test to determine whether a seizure was justified under the community caretaking doctrine, many state courts have adopted

variations of what has been referred to as a "reasonableness test."  Montana, for example, has adopted the following three-part test:

> First, as long as there are objective, specific and articulable facts from which an experienced officer would suspect that a citizen is in need of help or is in peril, then that officer has the right to stop and investigate.  Second, if the citizen is in need of aid, then the officer may take appropriate action to render assistance or mitigate the peril.  Third, once, however, the officer is assured that the citizen is not in peril or is no longer in need of assistance or that the peril has been mitigated, then any actions beyond that constitute a seizure implicating … the protections provided by the Fourth Amendment.

*State v. Lovegren*, 51 P.3d 471, 475-76 (Mont. 2002).

In *Lovegren*, a police officer observed a legally parked vehicle on the side of a highway, with its motor running but its headlights off.  He approached the vehicle, and, seeing that the driver appeared to be asleep, knocked on the window.  When the driver did not respond, the officer opened the vehicle door and the driver woke up and stated that he'd been drinking.  The Montana Supreme Court concluded that the officer "had objective, specific and articulable facts suggesting that Lovegren might be in need of assistance.  While Lovegren might simply have been asleep, he might just as likely have been ill and unconscious and in need of help."  *Id.* at 476.

In *Williams*, the Supreme Court of Delaware specifically adopted the three-part test established by the Montana Supreme Court in *Lovegren*.  *Williams*, 962 A.2d at 219 ("We adopt [the *Lovegren*] test to ensure that investigations conducted in Delaware under the community caretaker doctrine are reasonable.").  The *Williams* court held that a police officer's act of pulling his vehicle approximately ten feet behind the defendant, who was walking along the median of a highway at 3:50 a.m. on a cold and windy night, activating his strobe light, and asking the defendant if he needed a ride, was reasonable under the public servant exception under the community caretaking doctrine.  *Id.* at 221.

Specifically, it noted that the officer articulated objective and specific facts − the weather and the hour of the morning − that would lead an experienced officer to conclude that the defendant needed assistance. *Id.*

The Tennessee Supreme Court, in *McCormick*, adopted a test similar to the *Lovegren* test, and held that the community caretaking exception will justify a warrantless search if:

> the State establishes that (1) the officer possessed specific and articulable facts which, viewed objectively and in the totality of the circumstances, reasonably warranted a conclusion that a community caretaking action was needed, such as the possibility of a person in need of assistance or the existence of a potential threat to public safety; and (2) the officer's behavior and the scope of the intrusion were reasonably restrained and tailored to the community caretaking need.

494 S.W.3d at 687 (citation omitted).

Utilizing this test, the court determined that a police officer's act of approaching a vehicle that was parked between the entrance of a parking lot and the roadway, with its engine running, radio and headlights on, and a man slumped over the steering wheel, was necessary and reasonable because the occupant of the vehicle was "either asleep or unconscious, with his vehicle protruding partially onto the public roadway, placing him at risk of injury or death from a rear end collision." *Id.* at 688. Thus, the court held that the officer's actions were justified under the community caretaking function.

In *Kleven*, the South Dakota Supreme Court implicitly adopted a reasonableness test when it explained that the following elements must be established in order for the community caretaking doctrine exception to apply:

> the purpose of community caretaking must be the objectively reasonable independent and substantial justification for the intrusion; the police action must be apart from the detection, investigation, or acquisition of criminal evidence; and the

> officer should be able to articulate specific facts that, taken with rational inferences, reasonably warrant the intrusion.

887 N.W.2d at 743 (citation omitted).  Noting that "the community caretaking function is more akin to a health and safety check," the court held that police officers' entry into a vehicle that was parked on the side of the road at 2:00 a.m., with its engine running, where the driver appeared to be sleeping or passed out, in a location where the officers had seen the vehicle in the same spot an hour earlier, was justified under the community caretaking doctrine because it was reasonable for the officers to believe the driver might need assistance.  *Id.*

The West Virginia Supreme Court, in *Ullom*, adopted a test that includes the three prongs of the test utilized in South Dakota, but added an additional requirement that the state establish that, "[g]iven the totality of the circumstances, a reasonable and prudent police officer would have perceived a need to promptly act in the proper discharge of his or her community caretaker duties."  705 S.E.2d at 122.  In *Ullom*, the court concluded that a state trooper who observed the defendant's vehicle, which had its parking lights on and was parked in front of a gate blocking a dirt road at dusk, was reasonable under the community caretaking doctrine because "a reasonable and prudent officer in such a setting would have reasonably suspected that an occupant of the vehicle was in need of immediate help," and because the officer's motivation was to check on her safety.  *Id.* at 123.

Vermont and Mississippi likewise have adopted tests that require police officers to be able to point to specific and articulable facts which would reasonably suggest that an individual was in need of assistance.  Indeed, in *Hinton*, the Vermont Supreme Court observed that its test for the community caretaking exception for a traffic stop "has consistently turned on whether there were specific and articulable facts objectively leading the officer to reasonably believe that the defendant was in distress or needed

assistance, or reasonably prompted an inquiry in that regard." 112 A.3d at 773-74 (citation omitted).  In *Trejo*, the Supreme Court of Mississippi explained that, in applying the community caretaking function, the "ultimate standard" is reasonableness, and, in evaluating whether a stop is objectively reasonable, it looks to whether the officer can point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the stop.  86 So.3d at 689.

A number of states have adopted tests which encompass elements of both the balancing and reasonableness tests.  In *Hawkins*, for example, the Court of Appeals for the District of Columbia adopted "a hybrid of the reasonableness and balancing tests, in light of the totality of the circumstances, to assess whether an officer's community caretaking conduct comports with the Fourth Amendment:"

> In order for a law enforcement officer's community caretaking conduct to be reasonable, the government must show: 1) by specific and articulable facts that the government's conduct was totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute; 2) the government's conduct was reasonable considering the availability, feasibility, and effectiveness of alternatives to the officer's action; 3) the officer's action ended when the citizen or community was no longer in need of assistance; 4) the government's interests outweigh the citizen's interest in being free from minor government interference. This court does not require the government to pursue the least restrictive means of correcting the problem.

113 A.3d at 221-22.  The *Hawkins* court held that, under the foregoing test, an officer's entry into an idling vehicle in a parking lot in order to turn it off after approaching the individual standing outside of the vehicle was reasonable under the community caretaking function.  *Id.* at 222-23.

Similarly, the New Hampshire Supreme Court, in *Boutin*, explained that, in order to justify a seizure of a motorist under the community caretaking exception, a police

officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." 13 A.3d at 143 (citation omitted). The court noted that, in determining whether a seizure by a police officer acting in a non-investigatory capacity is reasonable, it must "balance the governmental interest in the police officer's exercise of his or her community caretaking function and the individual's interest in being free from arbitrary government interference." *Id.* (citation omitted). Under this standard, the *Boutin* court determined that a police officer's act of parking behind a motorist's vehicle − which was parked legally in a pull-off area, but was facing the opposite direction of traffic − and activating his emergency lights was not reasonable because the officer did not offer any specific and articulable facts suggesting that the occupant of the vehicle needed assistance, other than the fact that it was dark and there was snow on the ground. *Id.*

Finally, we note that several courts, including the Nebraska Supreme Court, have adopted a "totality of the circumstances" test to determine the reasonableness of a stop, which requires a general assessment of "the totality of the circumstances surrounding the stop, including 'all of the objective observations and considerations, as well as the suspicion drawn by a trained and experienced officer by inference and deduction'" that assistance might be needed. *Bakewell*, 730 N.W.2d at 339. In *Bakewell*, the court determined that an officer's act of pulling behind the defendant's vehicle after the defendant pulled off the road was justified under the community caretaking exception because the defendant's vehicle had slowed down five times while traveling on the highway before it pulled off the road completely and, "[c]onsidering the totality of the circumstances, it was reasonable" for the officer to conclude that the defendant was lost or that something was wrong with the defendant or his vehicle. *Id.*; *see also State v. Wixom*, 947 P.2d 1000, 1002 (Idaho 1997) (to be justified pursuant to a community

caretaking function, the intrusive action of the police must be reasonable in view of all the surrounding circumstances, and the officer's stop of a vehicle in order to locate witnesses to an earlier accident was not reasonable).

In the instant case, Appellant urges this Court to adopt the "reasonableness test" set forth by the Montana Supreme Court in *Lovegren*, which requires, *inter alia*, that a police officer point to specific and articulable facts which led him or her to believe that assistance was necessary, and an objective assessment by the court as to whether the officer's belief was reasonable. Appellant's Brief at 30. In this regard, Appellant emphasizes:

> An officer's *hunch* his or her assistance *may* be needed is insufficient. Someone who has legally and safely pulled over on the side of the road may be looking at a map, talking on a cell phone, sending a text message, or picking up an item dropped on the floor of the car. These are all otherwise lawful activities; distracting activities drivers are encouraged to avoid engaging in while driving, or actually criminally punished for performing.

*Id.* at 31 (emphasis original). In its brief discussion, based on its citations to *McDonough* and *Anderson*, *supra*, the Commonwealth seemingly supports the use of a balancing test, although it also argues that Trooper Frantz's actions were reasonable. Commonwealth's Brief at 10. After careful consideration, we conclude that the reasonableness test best accommodates the interests underlying the public servant exception while simultaneously protecting an individual's Fourth Amendment right to be free from unreasonable searches and seizures.

Specifically, we first hold that, in order for the public servant exception of the community caretaking doctrine to apply, police officers must be able to point to specific, objective, and articulable facts that would reasonably suggest to an experienced officer that a citizen is in need of assistance. *See Lovegren*, 51 P.3d at 475-76 ("as long as

there are objective, specific and articulable facts from which an experienced officer would suspect that a citizen is in need of help or is in peril, then that officer has the right to stop and investigate"); *Williams*, 962 A.2d at 219 (if there are "objective, specific and articulable facts from which an experienced officer would suspect that a citizen is in apparent peril, distress or need of assistance, the police officer may stop and investigate for the purpose of assisting the person"); *McCormick*, 494 S.W.3d at 687 (community caretaking exception will justify a warrantless seizure if, *inter alia*, "the officer possessed specific and articulable facts which, viewed objectively and in the totality of the circumstances, reasonably warranted a conclusion that a community caretaking action was needed"); *Kleven*, 887 N.W.2d at 743 (an officer "should be able to articulate specific facts that, taken with rational inferences, reasonably warrant the intrusion"); *Ullom*, 705 S.E.2d at 122 (same).

As Appellant suggests, there are many reasons why a driver might pull to the side of a highway: the driver may need to look at a map, answer or make a telephone call, send a text message,[13] pick something up off the floor, clean up a spill, locate something in her purse or in his wallet, retrieve something from the glove compartment, attend to someone in the back seat, or, as in the instant case, enter an address into the vehicle's navigation system. Pulling to the side of the road to perform any of these activities is encouraged, as a momentary distraction while driving may result in catastrophic consequences.

The Illinois Supreme Court observed in *McDonough*:

> Most people who appear to be in distress would welcome a
> genuine offer of police assistance. But permitting police to

---

[13] Indeed, 75 Pa.C.S. § 3316(a) prohibits the operation of a vehicle "while using an interactive wireless communications device to send, read or write a text-based communication while the vehicle is motion."

search or seize whenever they might be pursuing community-caretaking goals risks undermining constitutional protections. The challenge of [the] community-caretaking doctrine is to permit helpful police to fulfill their function of assisting the public, while ensuring that searches for law-enforcement purposes satisfy the requirements of the Fourth Amendment.

940 N.E.2d at 1109 (quoting M. Dimino, *Police Paternalism: Community Caretaking, Assistance Searches, and Fourth Amendment Reasonableness*, 66 Wash. & Lee L. Rev. 1485, 1562-63 (2009)). Requiring an officer to articulate specific and objective facts that would suggest to a reasonable officer that assistance is needed will cabin reliance on the exception and enable courts to properly assess its employment.

Second, we hold that, in order for the public servant exception of the community caretaking doctrine to apply, the police caretaking action must be independent from the detection, investigation, and acquisition of criminal evidence. As noted above, this is a common requirement to warrantless searches under all three exceptions of the community caretaking doctrine, including the emergency aid exception and the automobile impoundment/inventory exceptions. To describe this requirement, courts have utilized various terminology. In *Cady*, the high Court observed that police officers often engage in community caretaking functions which are "totally divorced" from the detection or investigation of crime. 413 U.S. at 441.[14] The South Dakota Supreme

---

[14] There is some debate as to whether the high Court's "totally divorced" language was intended to be observational or prescriptive. At least one court has included this precise language in its test for determining whether a warrantless search was permissible under the community caretaking doctrine. *See, e.g., Hawkins*, 113 A.3d at 222 (D.C. Court of Appeals specifically holding that, in order for a seizure to be permissible under the community caretaking doctrine, the police action be "totally divorced" from the detection and investigation of criminal activity). Other courts, however, have concluded that "*Cady* was merely observing that community caretaker functions are 'totally divorced' from an officer's law enforcement function because a different facet of police work is paramount in a community caretaker function than is paramount in a law enforcement function." *Kramer*, 759 N.W.2d at 609; *see also McCormick*, 494 S.W.3d at 687 ("We do not interpret [the language of *Cady*] as requiring consideration of a police officer's (continued…)

Court, in *Kleven*, explained that, for a warrantless search to be permissible under the community caretaking doctrine, "the police action must be *apart from* the detection, investigation, or acquisition of criminal evidence." 887 N.W.2d at 743 (emphasis added); *see also Ullom*, 705 S.E.2d at 122 ("The police officer's action must be apart from the intent to arrest, or the detection, investigation, or acquisition of criminal evidence."). In *McDonough*, the Illinois Supreme Court approved a warrantless search under the community caretaking exception because, *inter alia*, the "defendant's seizure was *unrelated to* the investigation of crime." 940 N.E.2d at 1109 (emphasis added). The North Dakota Supreme Court has explained that police action taken under the community caretaking doctrine must be "*separate* from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *City of Fargo v Sivertson*, 571 N.W.2d 137, 140 (N.D. 1997) (emphasis added). Regardless of the language used, a critical component of the community caretaking doctrine is that the police officer's action be based on specific and articulable facts which, viewed objectively and independent of any law enforcement concerns, would suggest to a reasonable officer that assistance is needed.

We are not suggesting, however, that an officer's contemporaneous subjective concerns regarding criminal activity will preclude a finding that a seizure is valid under the community caretaking function. The Wisconsin Supreme Court addressed a similar argument in *Kramer*, wherein the motorist argued that the "totally divorced" language from *Cady* "means that the officer must have ruled out any possibility of criminal activity before the community caretaker function is bona fide." 759 N.W.2d at 606. In rejecting the motorist's suggestion, the court reasoned:

(…continued)
subjective intentions."). We likewise are of the view that the high Court's statement in *Cady* was more of an observation by the Court rather than a specific requirement.

[T]he nature of a police officer's work is multifaceted. An officer is charged with enforcing the law, but he or she also serves as a necessary community caretaker when the officer discovers a member of the public who is in need of assistance. As an officer goes about his or her duties, an officer cannot always ascertain which hat the officer will wear—his law enforcement hat or her community caretaker hat. For example, an officer may come upon what appears to be a stalled vehicle and decide to investigate to determine if assistance is needed; however, the investigation may show that a crime is being committed within the vehicle. Therefore, from the point of view of the officer, he or she must be prepared for either eventuality as the vehicle is approached. Accordingly, the officer may have law enforcement concerns, even when the officer has an objectively reasonable basis for performing a community caretaker function.

To conclude otherwise would ignore the multifaceted nature of police work and force police officers to let down their guard and unnecessarily expose themselves to dangerous conditions.

Furthermore, to interpret the "totally divorced" language in *Cady* to mean that an officer could not engage in a community caretaker function if he or she had any law enforcement concerns would, for practical purposes, preclude police officers from engaging in any community caretaker functions at all. This result is neither sensible nor desirable.

759 N.W.2d at 608-09 (internal citations omitted). The court concluded that, "in a community caretaker context, when under the totality of the circumstances an objectively reasonable basis for the community caretaker function is shown, that determination is not negated by the officer's subjective law enforcement concerns." *Id.* at 608; *see also Smathers*, 753 S.E.2d at 386 (adopting an "objective method of inquiry into the purpose of a seizure in the community caretaking context," and declining to adopt a test where subjective concerns of crime prevention and investigation negate public safety concerns); *cf Brigham City, Utah v. Stuart*, 547 U.S. 398, 404 (2006) ("An

action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively* justify [the] action.' The officer's subjective motivation is irrelevant." (emphasis original, citations omitted)).

We agree that it is not realistic or wise to expect an officer to ignore the nature of his or her role in law enforcement − or its inherent dangers − in order for the public servant exception of the community caretaking doctrine to apply. Thus, so long as a police officer is able to point to specific, objective, and articulable facts which, standing alone, reasonably would suggest that his assistance is necessary, a coinciding subjective law enforcement concern by the officer will not negate the validity of that search under the public servant exception to the community caretaking doctrine. We caution, however, that "when the community caretaking exception is involved to validate a search or seizure, courts must meticulously consider the facts and carefully apply the exception in a manner that mitigates the risk of abuse." *McCormick*, 494 S.W.3d at 688.

Finally, we hold that, in order for the public servant exception to apply the level of intrusion must be commensurate with the perceived need for assistance. *See McCormick*, 494 S.W.3d at 687 (the officer's behavior and the scope of the intrusion must be "reasonably restrained and tailored to the community caretaking need"); *Lovegren*, 51 P.3d at 476 ("if the citizen is in need of aid, then the officer may take appropriate action to render assistance or mitigate the peril. . . . [O]nce, however, the officer is assured that the citizen is not in peril or is no longer in need of assistance or that the peril has been mitigated, then any actions beyond that constitute a seizure implicating . . . the protections provided by the Fourth Amendment."); *Williams*, 962 A.2d at 219 (same). Such a determination requires an assessment of the circumstances surrounding the seizure, including, but not necessarily limited to, the

degree of authority or force displayed, the length of the seizure, and the availability of alternative means of assistance.[15]

To summarize, in order for a seizure to be justified under the public servant exception to the warrant requirement under the community caretaking doctrine, the officer must point to specific, objective, and articulable facts which would reasonably suggest to an experienced officer that assistance was needed; the police action must be independent from the detection, investigation, and acquisition of criminal evidence; and, based on a consideration of the surrounding circumstances, the action taken by police must be tailored to rendering assistance or mitigating the peril. Once assistance has been provided or the peril mitigated, further police action will be evaluated under traditional Fourth Amendment jurisprudence.

### C. Application of the Public Servant Exception under the Community Caretaking Doctrine

Applying the standard we have adopted today, we must now determine whether the seizure of Appellant was justified under the public servant exception. A review of the record reveals that Trooper Frantz was on routine patrol on Interstate 79 at approximately 9:30 p.m. on June 14, 2013 when he observed Appellant's vehicle on the right shoulder of the road. At the suppression hearing, Trooper Frantz testified:

> I pulled beside her with my window already down, just, number one, to make sure, see if anybody was in this vehicle, and then, if there was, to make contact with her and then see if she needed any assistance. Nine out of ten times usually they're on their cell phone, I just give them a quick wave and I'm on my way.

---

[15] These factors are consistent with the evaluation of the level of intrusion into the citizen's freedom required under the balancing test. *See Anderson*, 362 P.3d at 1239; *Kramer*, 759 S.W.2d at 611.

N.T. Suppression Hearing, 5/28/14, at 7.

We have no reason to doubt Trooper Frantz's statement that he pulled alongside Appellant's vehicle simply to check to see whether she needed assistance. However, regardless of his intentions, based on our review of the record, Trooper Frantz was unable to articulate any specific and objective facts that would reasonably suggest that Appellant needed assistance. Indeed, Trooper Frantz conceded that he had not received a report of a motorist in need of assistance, and did not observe anything that outwardly suggested a problem with Appellant's vehicle. Moreover, although it was dark, the weather was not inclement. Finally, Appellant, who was inside her vehicle, did not have her hazard lights on.

Thus, we are constrained to hold that Trooper Frantz's seizure of Appellant was not justified under the public servant exception, and, therefore, that the evidence obtained as a result of that seizure should have been suppressed at trial.

### III. Conclusion

In summary, we conclude that, because a reasonable person in Appellant's position would not have felt free to leave after Trooper Frantz pulled his patrol car, with its emergency lights activated, alongside her vehicle, Appellant was seized and subjected to an investigative detention. Furthermore, we recognize that a warrantless search or seizure may nonetheless be deemed reasonable under the Fourth Amendment when conducted pursuant to the public servant exception to the warrant requirement under the community caretaking doctrine. However, we hold that Trooper Frantz's seizure of Appellant was not justified under the public servant exception, and, thus, that the evidence obtained as a result of Trooper Frantz's investigative detention of Appellant should have been suppressed. For these reasons, we reverse the order of

the Superior Court, vacate Appellant's judgment of sentence, and remand the matter to the Superior Court for remand to the trial court for further proceedings.

Chief Justice Saylor and Justice Dougherty join the opinion in full.

Justice Baer joins Parts I, II(A), and II(B) of the opinion and files a concurring and dissenting opinion.

Justice Donohue joins Parts I, II(A), and III of the opinion and files a concurring and dissenting opinion in which Justice Wecht joins.

Justice Mundy files a dissenting opinion.